## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Aladdin Knowledge Systems, Ltd., :
 :
   Plaintiff, :
 :
  v. :  CIVIL ACTION NO. 05-149 (GMS)
 :
Feitian Technologies Co., Ltd., et al., :
 :
   Defendants. :
_____:

## SUPPLEMENTAL BRIEF OF PLAINTIFF ALADDIN KNOWLEDGE SYSTEMS, LTD. IN OPPOSITION TO THE MOTION OF DEFENDANT FEITIAN TECHNOLOGIES CO., LTD. TO DISMISS FOR LACK OF PERSONAL JURISDICTION

CO-COUNSEL:

Michael K. Coran, Esquire
Mary Ellen O'Laughlin, Esquire
Albert Keyack, Esquire
260 S. Broad Street, 4th Floor
Philadelphia, PA 19102-5003

David S. Eagle (Bar No. 3387)
Patrick A. Costello (Bar No. 4535)
KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
Telephone (302) 552-5508
*deagle@klehr.com*
*pcostello@klehr.com*

Dated: November 20, 2006

Counsel for Plaintiff Aladdin Knowledge
Systems, Ltd.

# TABLE OF CONTENTS

Page

Table of Authorities ......................................................................................... ii

I. INTRODUCTION ....................................................................................1

II. PROCEDURAL AND FACTUAL BACKGROUND ...........................................1

III. ARGUMENT ........................................................................................5

   A. Feitian's Motion To Dismiss Should Be Denied Because This Court's
      Exercise Of Jurisdiction Is Appropriate Under The Federal Long Arm Statute.................5

     1. The Declaration of Zhao Wengwang has been shown to be unreliable and
        should be stricken. ...........................................................................................5

     2. Feitian's failure to cooperate in discovery supports a finding on this record
        that the exercise of jurisdiction under Rule 4(k)(2) is appropriate. ...............................8

       (a) Feitian's Rule 30(b)(6) witness ...............................................................8

       (b) Feitian's responses to written discovery requests ...................................19

       (c) Jurisdiction is warranted under Rule 4(k)(2) in these circumstances......................21

   B. In The Alternative, This Action Should Not Be Dismissed, But Should Be
      Transferred To The U.S. District Court For The Northern District Of Illinois
      Where It Could Initially Have Been Brought Pursuant To 28 U.S.C. §1631,
      And In Accordance With 28 U.S.C. § 1404(a) Criteria......................................24

     1. Facts obtained during jurisdictional discovery from third parties reflect
        that the matter could have been filed in the Northern District of Illinois
        warranting transfer there in the interest of justice as an alternative to dismissal .........25

       (a) ILCS 5/2-209(c)..............................................................................26

       (b) ILCS 5/2-209(a)(7).........................................................................26

       (c) ILCS 5/2-209(a)(1).........................................................................28

       (d) ILCS 5/2-209(a)(2).........................................................................32

     2. Transfer comports with the "interest of justice" requirement of 28 U.S. C. § 1631....35

     3. Transfer is also appropriate under 28 U.S.C. § 1404(a) factors .................................35

IV. CONCLUSION....................................................................................40

# TABLE OF AUTHORITIES

## FEDERAL CASES

APV North America, Investment v. Sig Simonazzi North America, Inc., 295 F.
Supp. 2d 393 (D. Del. 2002) ...............................................................37, 38

Akro Corp. v. Luker, 45 F.3d 1541 (Fed. Cir. 1995)............................................8

Asahi Metal Indust. Co. v. Superior Court, 480 U.S. 102 (1987)......................................33

BP Chemical Ltd. v. Formosa Chemical & Fibre Corp., 229 F.3d 254 (3d Cir.
2000) ......................................................................................................22, 23

Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558
(Fed. Cir. 1994).............................................................................8, 32, 33, 34

Black Horse Lane Associate, L.P. v. Dow Chemical Corp., 228 F.3d 275 (3d Cir.
2000) .........................................................................................................9

Blackwell v. Marina Associates, 2006 WL 573793 (E.D. Pa. March 9, 2006).................35

Blistex Inc. v. Circle Laboratories, Inc., 2000 WL 1154635 (N.D. Ill. Aug. 15,
2000) ........................................................................................................31

Blizzard v. FCI Elkton, 2006 WL 2934826 (E.D. Pa. Oct. 12, 2006) ..............................35

Burger King Corp. v Rudzewicz, 471 U.S. 462 (1985).......................................................8

Custom Energy, LLC v. The Conservation Group, 93 F. Supp. 2d 1145 (D. Kan.
2000) .........................................................................................................6

Dean v. Motel 6 Operating L.P., 134 F.3d 1269 (Fed. Cir. 1998)...............................6, 7, 9

Electronics for Imaging, Inc. v. Coyle, 340 F.3d 1344 (Fed. Cir. 2003)............................7

FS Photo Inc. v. Picturevision, Inc., 48 F. Supp. 2d 442 (D. Del. 1999)..........................36

Farmers Insurance Exch. v. Portage La Prairie Mutual Insurance Co., 907 F.2d
911 (9th Cir. 1990).....................................................................................21

Gummow v. Superior Ratchet and Tool Co., 1997 WL  374406 (N.D. Ill. June 20,
1997) ...................................................................................................33, 38

Hyatt International Corp. v. Coco, 302 F.3d 707 (7th Cir. 2002).......................................25

ii

ISI International, Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548 (7th Cir. 2001) ...................................................................................................22

Inamed Corp. v. Kuzmak, 249 F.3d 1356 (Fed. Cir. 2001) ...............................33

Jacobs/Kahan & Co. v. Marsh, 740 F.2d 587 (7th Cir. 1984) ...........................28

Jumara v. State Farm Insurance Co., 55 F.3d 873 (3d Cir. 1995) ...............36, 37

Keeton v. Hustler Magazine, Inc., 465 U.S. 770 (1984) ...............................32, 34

Mateer v. Interocean American Shipping Corp., 2006 WL 997248 (N.D. Ca. April 17, 2006).................................................................................................20

Mentor Graphics Corp. v. Quickturn Design Systems, Inc., 77 F. Supp. 2d 505 (D. Del. 1999) .............................................................................................35, 39

Monsanto Co. v. Syngenta Seeds, Inc., 443 F. Supp. 2d 636 (D. Del. 2006)..............23, 24

Motorola Inc. v. Pc-Telegraph, Inc., 58 F. Supp. 2d 349 (D. Del. 1999) ..........36

Mwani v. Bin Laden, 417 F.3d 1 (D.C. Cir. 2005)...............................................22

North America Philips Corp. v. American Vending Sales, Inc., 35 F.3d 1576 (Fed. Cir. 1994)................................................................................................33

Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)...............................................38

Quill Corp. v. North Dakota, 504 U.S. 298 (1992)................................................7

Ricoh Co., Ltd. v. Aeroflex Inc., 279 F. Supp. 2d 554 (D. Del. 2003)...............39

School Stuff, Inc. v. School Stuff, Inc., 2001 WL 558050 (N.D. Ill. May 21, 2001) ................................................................................................................31

Telecordia Technologies, Inc. v. Alcatel S.A., 2005 WL 1268061 (D. Del. May 27, 2005) .............................................................................................22, 23, 24

Toys R Us, Inc. v. Step Two, S.A., 318 F.3d 446 (3d Cir. 2003).........................3

U.S. v. Berkowitz, 328 F.2d 358 (3d Cir.), cert. denied, 379 U.S. 821 (1964) .................36

Van Dusen v. Barrack, 376 U.S. 612 (1964) ......................................................36

iii

Weber v. McDonald's System of Europe, Inc., 660 F. Supp. 10 (D. Del. 1985)...............36

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980) ........................34

Zeigler v. Dart Industries, 383 F. Supp. 362 (D. Del. 1974) .............................................38

## STATE CASES

Commerce Trust Co. v. Air 1st Aviation Companies, Inc., 851 N.E.2d 131 (Ill.
    App. Ct. 2006).......................................................................................................28, 31

Kostal v. Pinkus Dermatopathology Laboratory, P.C., 827 N.E.2d 1031 (Ill.
    2005) ...............................................................................................................................26

Rollins v. Ellwood, 565 N.E.2d 1302 (Ill. 1990)................................................................25

Viktron Ltd. Partnership v. Program Data Inc., 759 N.E.2d 186, (Ill. 2001) ....................34

## STATUTES

28 U.S.C. § 610.....................................................................................................................25

28 U.S.C. § 1391(d) ..........................................................................................................1, 35

28 U.S.C. § 1404(a) .....................................................................................1, 24, 35, 36, 40

28 U.S.C. § 1631...............................................................................1, 24, 25, 34, 35, 40

ILCS 5/2-209 ...............................................................................25, 26, 28, 32, 33, 38

Ill. Const. 1970, art. I, § 2 .................................................................................................25

## RULES

Fed.R.Civ.P. 4(k)(2)...................................................1, 3, 4, 8, 21, 22, 23, 24, 39

Fed.R.Civ.P 30(b)(6)..........................................................................................3, 4, 8, 9

Fed.R.Civ.P. 56(e) ..............................................................................................................6

Fed.R.Evid. 602 ..................................................................................................................6

Fed.R.Evid. 803(6)..............................................................................................................6

I.    **INTRODUCTION**

Plaintiff Aladdin Knowledge Systems, Ltd. ("Aladdin") submits this supplemental

memorandum of law in further opposition to the motion of Defendant Feitian Technologies Co.,

Ltd. ("Feitian") to dismiss for lack of personal jurisdiction. Largely as a result of Feitian's

tactics in responding to Aladdin's limited jurisdictional discovery regarding Feitian's contacts

with Delaware, Aladdin is willing to acknowledge that on this record it has not established the

"something more" that the Court required to find jurisdiction based upon Delaware's long arm

statute in this matter. [D.I. 48]. Nonetheless, it has established a basis on this record for

retaining jurisdiction in this Court pursuant to Fed.R.Civ.P. 4(k)(2). Aladdin therefore seeks

denial of the motion to dismiss with prejudice and a direction that Feitian file an answer to the

Complaint within twenty days of the Court's Order.

In the alternative, pursuant to 28 U.S.C. § 1631, in the interest of justice this matter

should be transferred rather than dismissed because Aladdin has established on this record that it

initially could have filed suit against Feitian in the U.S. District Court for the Northern District of

Illinois: venue is proper there pursuant to 28 U.S.C. § 1391(d) and personal jurisdiction over

Feitian is consistent with the exercise of due process under the Fifth Amendment and the long

arm statute of Illinois. Such a transfer is also warranted by weighing the public and private

factors underlying 28 U.S.C. § 1404(a) transfer motions.

II.    **PROCEDURAL AND FACTUAL BACKGROUND**

Aladdin instituted this action in March 2005 against Feitian, a Chinese entity located in

Beijing, and eight of its distributors for infringement of two (2) patents on computer-security

technology owned by Aladdin.[1]    Aladdin had good faith reasons for initially instituting suit here

---

[1] Aladdin incorporates by reference the Statement of Facts set forth in its Memorandum of Law in Opposition to
Feitian's Motion to Quash Service and to Dismiss for Lack of Jurisdiction, D.I.43, § III.

based upon its pre-suit investigation indicating that a number of Feitian's U.S. distributors, including its principal distributor, RF Ideas, Inc., d/b/a Security Tokens ("RF Ideas"), were incorporated in Delaware and presumably did business here, that Feitian has been an advertiser in publications distributed throughout the U.S., including in Delaware, and that Feitian maintains an interactive website, accessible from Delaware. Feitian's distributors were listed on its website at the time that Aladdin filed suit and many of them had hyperlinks from Feitian's interactive website to their own interactive website and many also had hyperlinks from their websites to Feitian's website. [D.I. 1 (Complaint), ¶¶3-11, 16, 26, 29; D.I. 43, Ex. E, ¶¶5-6].

In August 2005, Aladdin effectuated service of its Complaint on Feitian through the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention"). On September 12, 2005, Feitian moved to dismiss for lack of personal jurisdiction and asserted a hypertechnical argument for quashing Aladdin's service of the Complaint: "Plaintiff has not presented evidence that it obtained an executed certificate of service as required by Article 6 of the Hague Convention." [D.I. 41 (Feitian Opening Brief) at 4].

In response to Feitian's motion, Aladdin submitted materials supporting the imposition of jurisdiction under the Delaware long arm statute and denial of the motion to quash. [D.I. 43, § II]. With its response to the motion to quash Aladdin filed the executed certificate of service required by Article 6 of the Hague Convention with the Court. [D.I. 46]. Aladdin also sought, if necessary for the Court's determination of the jurisdiction issue, leave to conduct jurisdictional discovery. [D.I. 43, § IV. C.]. By Order entered February 24, 2006, the Court denied Feitian's motion to quash service as moot and granted Aladdin leave to "engage in limited jurisdictional

2

discovery into Feitian's contacts with Delaware..." and ordered that "the motion to dismiss will be denied without prejudice pending the results of that discovery." [D.I. 48].[2]

In its response to Aladdin's first set of jurisdictional discovery requests, Feitian: (1) admitted making offers for sale and sales of the infringing products in the United States and attending trade conferences in California; (2) denied doing any business in Delaware; and, (3) objected to providing any information as to its contacts with any state other than Delaware. Based upon Feitian's responses to the effect that has never had any contact with Delaware, Aladdin invited Feitian to name a forum with which it had sufficient contacts to authorize jurisdiction under that forum's long arm statute for transfer there or, alternatively, to state it could not make such a selection. [D.I. 73 (8/24/06 joint letter agenda)]. Feitian declined this invitation. [*See* D.I. 73 (8/24/06 joint letter agenda)]. Aladdin therefore requested that the Court overrule the objections and require Feitian to respond to its contacts with the United States as a whole to allow Aladdin to establish that jurisdiction was proper in this Court pursuant to Fed.R.Civ.P. 4(k)(2). Rule 4(k)(2) is a rule of civil procedure commonly referred to as the "federal long arm statute." *See, e.g., Toys 'R Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 455 (3d Cir. 2003). [D.I. 73 (8/24/06 joint letter agenda)]. By Order dated August 28, 2006, the Court denied Aladdin's request to conduct jurisdictional discovery regarding Feitian's contacts with the

---

[2]The Court also granted Aladdin's request to take jurisdictional discovery concerning the contacts of Defendant RS-Computer with Delaware. [D.I. 48]. Subsequently, RS Computer asserted objections to Aladdin's discovery requests and would only respond to discovery concerning its contacts with Delaware and California. RS-Computer's 30(b)(6) designee, President Peter Rasch, testified that from October 1999 to present RS-Computer has not done any business in the United States and although it distributes Feitian's products, it has not offered them for sale or sold them in the United States. Notes of Testimony of August 31, 2006 deposition of Peter Rasch, relevant portions of which are attached as Exhibit "A," at 9, ln. 20 through 14, ln. 20; 25, ln. 6-23; 35, ln. 17-22. Mr. Rasch also testified that RS-Computer has not done any business with Sysgen, located in Melville, NY, since October 1999. [Ex. A, 37, ln. 19-22]. Based upon this testimony, Aladdin is dismissing without prejudice its action against RS-Computer and is not making any further submission regarding the Court's denial without prejudice of RS-Computer's motion to dismiss.

3

U.S. as a whole, but granted Aladdin the right to take "limited and appropriate jurisdictional discovery to assess whether jurisdiction is proper in California." [D.I. 75].

Given that Feitian conceded that it conducted business somewhere in the fifty states, Aladdin tried to focus its jurisdictional discovery to identify Feitian's offers for sale and sale of infringing products. Due to Feitian's patently evasive method of responding to Aladdin's requests for jurisdictional discovery, however, Feitian failed and refused to divulge that sales information. Fortunately, pursuant to a subpoena, settling defendant RF Ideas, Feitian's former U.S. distributor, did produce detailed sales information concerning sales of infringing Feitian products along with detailed information concerning Feitian's dealings with RF Ideas. The information in the RF Ideas' documents is discussed in detail in Section III.B., below. [3]

Feitian has not cooperated in jurisdictional discovery, including failing to comply with its Fed.R.Civ.P 30(b)(6) obligations and submitting an unreliable Declaration, casting its assertions that it has no pre-suit contacts with Delaware into doubt and warranting a finding that Aladdin has established a basis for jurisdiction over Feitian in this Court pursuant to Fed.R.Civ.P. 4(k)(2).[4]

---

[3] Prior to its settlement with defendant RF Ideas, Aladdin had not had access to RF Ideas' records concerning its efforts to distribute Feitian's products in Delaware or elsewhere in the United States. As part of that settlement, RF Ideas agreed to respond to any properly issued subpoena in this action. [D.I. 43, Ex. E, ¶7 and Ex. 2]. Aladdin subsequently served a document subpoena to RF Ideas. In response, RF Ideas produced in excess of 800 pages. In contrast, Feitian produced only 65 pages of documents in response to Aladdin's jurisdictional discovery requests. In fact, with the exception of a Feitian-RF Ideas' Distribution Agreement and a equipment leasing contract, Feitian did not produce any sales information or written communications between RF Ideas and Feitian despite the fact that those records were produced by RF Ideas. [*See* documents produced by Feitian, bates numbered FT 00001-FT 00065, attached as Exhibit "B"].

[4] The limited jurisdictional discovery deadline was October 31, 2006. [D.I. 79].

III.    **ARGUMENT**

A.    **Feitian's Motion To Dismiss Should Be Denied Because This Court's Exercise Of Jurisdiction Is Appropriate Under The Federal Long Arm Statute**

1.    **The Declaration of Zhao Wengwang has been shown to be unreliable and should be stricken.**

In its initial response to Feitian's motion to dismiss, Aladdin highlighted the gaps in Feitian's proffered evidence supporting its assertion that it did not engage in business in Delaware. [D.I. 43] In allowing Aladdin to conduct jurisdictional discovery, the Court specifically stated that the dismissal of Feitian's motion was "without prejudice pending the results of that discovery." [D.I. 48]. With its initial motion to dismiss Feitian submitted the Declaration of one Zhao Wengwang. [D.I. 41, Ex. A]. As with many of Feitian's assertions and discovery responses, Aladdin has demonstrated that the Wengwang declaration is neither credible nor based upon competent information. Aladdin was able to determine that Zhao Wengwang had neither written the declaration nor had he or anyone else reviewed any Feitian business records or documents in preparing it [Feitian Technologies Co., Ltd.'s Amended Responses to Plaintiff's First Set of Interrogatories on Jurisdictional Issues, attached as Exhibit "C," No. 25; Feitian Technologies Co., Ltd.'s Amended Responses to Plaintiff's Second Request for Admissions on Jurisdictional Issues, attached as Exhibit "D," Nos. 19, 20, 21].[5] Mr. Wengwang is no longer employed by Feitian. [Ex. C, No. 25].

---

[5] Although Feitian implies in its responses to Interrogatory No. 25 and Second Request for Admissions No. 21 that its counsel may have reviewed documents in preparing Mr. Wengwang's declaration, during the discovery teleconference with the Court on July 12, 2006, Feitian's counsel admitted on the record that no documents were reviewed. [D.I. 65 (July 12, 2006 discovery teleconference transcript), relevant portions of which are attached as Exhibit "E," at 22, ln. 3-23, ln. 16]. Feitian's counsel stated that he would "update the answers to interrogatories accordingly," but the amended answer to Interrogatory No. 25 retained this inaccurate implication. [*See* Technologies, Co., Ltd.'s Second Amended Responses to Plaintiff's First Set of Interrogatories on Jurisdictional Issues, attached as Exhibit "F," No. 25].

5

Fed.R.Evid. 602 provides that "[a] witness may not testify as to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Since Feitian admitted that no materials were reviewed in preparing the declaration and that Mr. Wengwang did not prepare it, the declaration is inherently unreliable and does not support Feitian's claim that it lacks sufficient minimum contacts with Delaware. The proffered evidence may not be used in support of the motion to dismiss; it is inadmissible under Fed.R.Evid. 602 and should be stricken.[6] *See Custom Energy, LLC v. The Conservation Group,* 93 F. Supp.2d 1145, 1146 (D. Kan. 2000) ("To be sufficient to put the contested fact in issue, affidavits submitted in support…of a motion to dismiss for lack of jurisdiction must comply with the requirements of Fed.R.Civ.P. 56(e); i.e., they must be made with personal knowledge, set forth such facts as would be admissible as evidences, and show affirmatively that the affiant is competent to testify to the matters stated therein."); *see also, Dean v. Motel 6 Operating L.P.,* 134 F.3d 1269, 1272 (Fed. Cir. 1998) (Rule that a plaintiff opposing motion to dismiss only has to make a prima facie showing of jurisdiction "is appropriate, '[a]ny other rule would empower a defendant to defeat personal jurisdiction merely by filing a written affidavit contradicting jurisdictional facts alleged by a plaintiff.' (Citation omitted)").[7]

Further, the statement in Mr. Wengwang's declaration that Feitian has not "contracted with any persons residing in Delaware to act on its behalf with respect to marketing, distributing or servicing any of Defendant's goods or services [D.I. 41, Ex. A, ¶4], is specifically contradicted by RF Ideas' Affidavit, [D.I. 43, Ex. E, ¶¶3, 4], and its Distribution Agreement with

---

[6] Because no business records were reviewed the declaration does not fall within any exception to the hearsay rule enumerated in Fed.R.Evid. 803(6). Rule 803(6) allows admission of hearsay evidence if it relates to records kept in the ordinary course of business. There is no evidence that Mr. Wengwang's declaration was based on any business records kept by Feitian and therefore the Rule 803(6) exception is inapplicable.

[7] The court noted that this apparently "lopsided standard" is not really lopsided since a defendant has other options and may always "invoke the court's discretion to order a pretrial evidentiary hearing…." *Dean v. Motel 6 Operating L.P.,* 134 F.3d 1269, 1272 (Fed. Cir. 1998).

6

Feitian. [Ex. B (FT 00038-44), at 1-2 and § 5.1]. That agreement provides that RF Ideas' "Territory" included the entire U.S.; that Feitian "wishes, through the Distributor, to facilitate the marketing and distribution of the Product in the Territory"; and that RF Ideas "will devote its best efforts to promote, sell and service the Product in the Territory...." Plainly, the Territory, as defined, included Delaware. [*See* D.I. 43, Ex. E, ¶4].

Moreover, the thrust of Mr. Wengwang's declaration is that Feitian does not have a <u>physical</u> presence in Delaware, [D.I. 41, Ex.A, ¶¶3-6; 9-11], a factor that is no longer required in determining whether personal jurisdiction exists over a foreign defendant:

> [I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence with a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' towards residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Quill Corp. v. North Dakota*, 504 U.S. 298, 307-08 (1992), *quoting Burger King Corp. v Rudzewicz*, 471 U.S. 462, 476 (1985).

Where, as here, the motion to dismiss is decided under written submissions, the plaintiff only has to make a prima facie showing that the defendant is subject to jurisdiction, "a showing that can be controverted by a defendant's affidavits." *See Electronics for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003).[8] The declaration of Zhao Wengwang was the sole support for Feitian's factual assertions in its motion to dismiss. In making its final determination on the motion to dismiss, the Court should not consider Feitian's controverting evidence proffered in the unreliable declaration of Zhao Wenwang. *Dean v. Motel 6 Operating L.P.*, 134 F.3d at

---

[8] Federal Circuit law applies here. According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. *Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed. Cir. 1995)."

7

12721269, 1272 (Fed. Cir. 1998). Aladdin's factual allegations that form the basis for the

exercise of this Court's jurisdiction must be taken as true. *Beverly Hills Fan Co. v. Royal*

*Sovereign Corp.*, 21 F.3d 1558, 1563 (Fed. Cir. 1994) ("Since they are not directly controverted,

plaintiff's factual allegations are taken as true for purposes of determining jurisdiction.").

>    2.    **Feitian's failure to cooperate in discovery supports a finding on this record that the exercise of jurisdiction under Rule 4(k)(2) is appropriate.**

>        (a)    **Feitian's Rule 30(b)(6) witness**

Feitian's cavalier approach to its sworn statements about its U.S. contacts is also

illustrated by the witness Feitian designated in response to Aladdin's Fed.R.Ci.v.P. 30(b)(6)

notice. Rule 30(b)(6) requires a party to designate one or more persons who "shall testify as to

matters known or reasonably available to the organization." Although Feitian has an English

language website and communicates with customers and distributors in the United States in

English, Feitian advised Aladdin that its sole 30(b)(6) witness could not speak English and that

Aladdin would have to obtain a Mandarin interpreter. Aladdin took the deposition of Feitian's

30(b)(6) designee in two parts, because after approximately two hours on the first night, Feitian's

witness, Wei Li, requested a recess. [Notes of Testimony of August 30, 2006 deposition of Wei

Li ("Li I"), attached as Exhibit "G," at 49, ln. 23-52, ln. 13].[9]

Mr. Wei Li, through carefully circumscribed answers, essentially testified that Feitian had

no contacts with Delaware or California after October 1999. However, as is set forth below, Mr.

Li's testimony was not credible; he obviously was not properly prepared to testify as a corporate

designee and his answers and refusals to answer plainly were crafted to frustrate all of Aladdin's

---

[9] Feitian required Aladdin to depose its designee during what it claimed to be Beijing's normal business hours and therefore each deposition began at 9 p.m., EST.

efforts to obtain meaningful information. Moreover, Mr. Li's testimony was contradicted by the evidence contained in RF Ideas' documents.

Given Feitian's failure to produce a properly prepared Rule 30(b)(6) designee, Feitian's denial of jurisdictional contacts should be rejected. *See Black Horse Lane Assoc., L.P. v. Dow Chemical Corp.*, 228 F.3d 275, 304 (3d Cir. 2000) ("[W]e hold that when a witness is designated by a corporate party to speak on its behalf pursuant to Rule 30(b)(6), producing an unprepared witness is tantamount to a failure to appear that is sanctionable under Rule 37(d)."). The conduct of the deposition is revealing.

Feitian objected to any questions as to its U.S. contacts other than its contacts with Delaware and California. [Li I at 5, ln. 12 to 6, ln. 2]. However, during the first part of the deposition, it was apparent that Feitian's designee had little or no personal knowledge about Feitian's contacts with Delaware or California and that Feitian did little to prepare Mr. Li to testify as its designated witness to respond to questions concerning Feitian's post-October 1999 contacts with Delaware and California. [*See, e.g.,* Li I at 14, ln. 3-14; 15, ln. 13-15; 16, ln. 13-19; 52, ln. 17-53, ln.12].

Mr. Li is the Vice Manager in Charge of Sales and has held that position for two years; during the prior six years he was the Vice Manager of Accounting. [Li I at 10, ln. 4-15]. Mr. Li testified that he is not in charge of sales to the U.S., but that his subordinate, Hui Lui, reported to him about U.S. sales. [Li I at 10, ln. 21-22; 11, ln. 2-19; 13, ln. 16-18, 24].[10] Hui Lui, who has been employed as a Sales Manager by Feitian for less than a year, is also the one who told Mr. Li that he was to be Feitian's designated witness for the Rule 30(b)(6) deposition. [Li I at 14, ln. 15-18; 15, ln. 5-12; 32, ln. 2-4]. When the deposition reconvened, Mr. Li acknowledged that Hui

---

[10] Later, Mr. Li testified that Yuhong Lui had been in charge of U.S. sales, but she quit. [Li I at 13, ln. 6-15]. There is still a department of international sales and marketing; Mr. Li is in charge of it. [Li I at 53, ln. 22-54, ln. 7].

9

Lui uses the anglicized name of Michael Lui and that Mr. Lui is a fluent writer and speaker of English.[11]  [Notes of Testimony of October 25, 2006 deposition of Wei Li ("Li II"), attached as Exhibit "H," at 44, ln. 4-5, 17-20].  Mr. Li amended his prior testimony to state that it was Feitian's directors who decided he was to be the designee, but he refused to identify any of them by name.  [Li II at 48, ln 11-49, ln. 3].

Mr. Li did nothing to prepare for the first part of his testimony other than listen to some oral reports from Mr. Lui, which reports he did "not remember clearly now."  [Li I at 14, ln. 3-14].  He did not review any documents and did not talk to any other person to obtain information.  [Li I at 15, ln. 13-15; 16, ln. 1-6].  Mr. Li only asked Hui Lui to get information about Feitian's contacts with Delaware, not California, and the only information he received about California was that Feitian had attended the RSA Conference in California.  [Li I at 16, ln. 7-19; 19, ln. 12-24; 20, ln. 1-6; 32, ln. 5-16].[12]  Mr. Li also testified that although he was waiting for Hui Lui to give him information about sales to Delaware and California, he had not given Mr. Lui any direction as to how to look into this matter.  [Li I at 43, ln. 12-44, ln. 10].

Other than with Mr. Lui, Mr. Li had no discussions with anyone else about answering Aladdin's questions as to whether or not Feitian has made offers of sale or sales or provided services to anyone in Delaware or California.  [Li I at 44, ln. 11-16].  Further, although Mr. Lui advised him that Feitian received email inquiries about its products from the United States, Mr. Li did not ask Mr. Lui to review them to see if there were any emails from anyone located in

---

[11] No explanation was given as to why the fluent English speaker, and employee involved with U.S. sales, Hui Lui, was not produced as the designee.  Also, despite his protests that he needed an interpreter, on the second night it became apparent that Mr. Li had a sophisticated understanding of the English language.  [*See*, Li II at 9, ln. 14-15; 15, ln. 1-16; 33, ln. 21-35, ln. 15 (witness understanding objection and responding by echoing counsel's language without the objection being translated)].

[12] Initially Feitian took the position it would "take under advisement" whether it would produce its witness again to testify about California contacts, contending that the mention of the RSA Conference attendance "which we already admitted to," might be the only contact that exists in California.  [Li I at 20, ln. 9-22, ln. 8].  This is ironic given that RF Ideas' records reflected numerous sales of Feitian products to California residents, as discussed below.

10

Delaware or California. [Li I at 28, ln. 24-29, ln.16]. Despite this lack of preparation or personal knowledge, Mr. Li testified that Feitian had no sales to or contacts with Delaware. [Li I at 30, ln. 15-18; *see also,* Li II at 17, ln. 13-15; 23, ln. 9-15]

Mr. Li's answers to questions posed concerning basic categories of business records were also incredible. According to Mr. Li, Feitian conveniently retained precious few records that businesses ordinarily retain. Feitian communicates by fax and phone, but does not keep phone records or phone bills and Mr. Li was "not sure" if all the fax records were kept in either the personal file of Liu Yuhong, the former international sales and marketing manager, or Hui Lui, the current sales manager. [Li I at 36, ln. 1-4; 38, ln. 12-17; 39, ln. 12-13]. Mr. Li was also "not sure" if anyone had reviewed every fax in either Ms. Yuhong's file or Mr. Lui's file to determine whether there were any faxes to or from the States of Delaware or California. [Lii I at 39, ln. 15-20]. Although Feitian generates invoices for its sales, it could not review invoices from October 1999 forward as it only keeps the most recent three months, sometimes longer. [Li I at 44, ln. 17-19; 45, ln. 6- 17]. Hui Lui, the sales manager, is responsible for keeping invoices, but he does not have all the sales invoices for Feitian's sales. [Li I at 46, ln. 1-15].

Mr. Li refused to answer questions about Feitian's procedure if a resident of California or Delaware wanted to buy a product from Feitian:

> Q.    [D]escribe for me what would happen if I am located in California and I want to buy a product of Feitian. What steps would I have to take and what steps would Feitian take in that transaction?
>
> A.    I can't answer this question.
>
> Q.    Why?
>
> A.    Now we don't respond to any inquiry from Delaware or California.

> Q.    Why don't you respond to any inquiries from Delaware and California?
>
> A.    Because now we do not have a specific salesperson in charge of this.
>
> Q.    ...But at any time since 1999 if...I'm in California and I try to buy a Feitian product or get a service of Feitian's, describe...the steps that would be taken in that transaction.
>
> A.    I can't answer this hypothetical question...my testimony is only regarding the situation in Delaware and California.

[Li I at 40, ln. 17-41, ln. 21].

When asked about sales to Delaware or California before Ms. Yuhong left Feitian's employ, Mr. Li stated he did not know. [Li I at 42, ln. 15-18]. When asked whether there had been any offers for sale or sales made before Ms. Yuhong worked at Feitian to California, Mr. Li stated he was not sure. [Li I at 42, ln. 23-43, ln. 3]. Mr. Li did not know if Feitian had done any business in California since October 1999. [Li I at 32, ln. 5-8]. In effect, through Mr. Li's lack of preparation and lack of knowledge, Feitian was able to frustrate Aladdin's efforts to gain information at the core of every business and as to which any business would maintain detailed records, its sales.

Feitian, through the testimony of its designee, had the obvious intent not to provide full and complete answers as to its contacts with Delaware. Mr. Li testified that if Feitian were to get an inquiry from someone in Delaware, it would not respond because "we do not have a specific person in charge of sales in U.S. market" now and he did not know, and did not ask for, information about the procedure used when Feitian did have a person in charge of U.S. sales. [Li I at 29, ln. 17-30, ln. 11]. When asked "[w]hen was the last time that Feitian had someone in charge of sales to the U.S.," Mr. Li responded, "I don't know. I need to ask around." [Li I at 30, ln. 12-15].

12

Mr. Li also testified that Feitian has not done any business in Delaware since October 1999; this testimony was based solely upon his conversations with the previous sales manager about a year ago and Mr. Lui more recently, conversations he also said he could not clearly recall. [Li I at 30, ln. 15-31, 32, ln. 1; 14, ln. 3-14].

In addition to not being prepared to testify, Mr. Li did not appear to be candid in his responses to Aladdin's questions. When asked if a person living in California could buy a product from Feitian, Mr. Li's answer was a flat, "no." [Li I at 22, ln. 13-15].[13]

Mr. Li was then asked "[d]oes Feitian sell -- make sales of its products through distributors or partners or other companies that are located in the United States?" [Li I at 22, ln. 16-18]. Feitian's counsel objected to the question "to the extent that it calls for information outside of California or Delaware" and asked that the objection be translated for the witness. [Li I at 22, ln. 16-23-23, ln. 11]. Mr. Li then replied, "I will only answer questions about Delaware and California." [Li I at 23, ln. 17-18].

Mr. Li also denied that Feitian had "any company who distributes Feitian's products in Delaware or California." [Li I at 23, ln. 20-22]. When asked if he knew what Feitian's relationship with RF Ideas was, Mr. Li replied, "This company is located neither in California nor Delaware." [Li I at 24, ln. 4-14]. When asked whether Feitian had "an agreement with RF Ideas whereby it could sell Feitian's products anywhere in the United States including in Delaware and California," Feitian's counsel objected "to the extent that it seeks information outside of Delaware and California...," [Li I at 24, ln. 20-25, ln. 5], and Mr. Li then responded,

---

[13] That denial is completely contradicted by the documents produced by Feitian showing direct sales to residents of California in 2006, Ex. B, and by the documents produced by RF Ideas showing pre-suit direct sales and direct communications by Feitian to residents of California. [*See, e.g.,* RF Ideas' documents regarding Feitian's California sales, attached as Exhibit "I." This testimony should be considered by the Court when assessing the credibility of Feitian's discovery responses and its denial that it has offered for sale or sold infringing products in Delaware.

13

"Well, because this company is not in Delaware nor California so I can't answer this question."

[Li I at 25, ln. 11-12].  The following exchange ensued:

> Q.     Did Feitian have an agreement with RF Ideas pursuant to which RF Ideas could make sales of Feitian products anywhere in the United States?
>
> A.     It's the issue of RF Ideas Company.
>
> Q.     …I do not understand your answer.  Could you explain it to me?
>
> A.     Well, it's the same answer as I answered before.  This company is not in those two states, so I can't answer this question.
>
> Q.     Have you ever looked at the distribution agreement between Feitian and RF Ideas?
>
> A.     No.
>
> ***
>
> Q.     Did you ever look at…any of the documents that were produced by Feitian in response to our jurisdictional discovery?
>
> A.     No.

[Li I at 25, ln. 8-24; 26, ln. 3-6].[14]

On the second night of his deposition, Mr. Li was no more credible or forthcoming than on the first.  Despite having been provided with copies of all the materials produced by RF Ideas in response to Aladdin's subpoena, Feitian refused to allow Mr. Li to answer any questions about Feitian's contacts with Illinois.  [Li II at 4, ln. 2-18].[15]

---

[14] Feitian's counsel also objected to, and Mr. Li refused to answer, any questions about Defendant AZ-Tech Software, a Missouri corporation identified on Feitian's website at the time of suit as a U.S. distributor of infringing products, because "[t]his company is not located in those two states."  [D.I. 1, Complaint, ¶ 5; Li I at 28, ln. 2-22].  On this record it would not be reaching to infer that AZ-Tech Software has information regarding offers of sale and sales by Feitian to residents of Delaware and California.

[15] RF Ideas would not agree to Feitian's receipt of the materials without a form of protective order acceptable to it.  The parties' negotiated Stipulated Protective Order [D.I. 80] was approved by the Court on October 12, 2006.  Feitian refused to produce the witness for the second night of his testimony until the RF Ideas' documents were produced to it.

14

Mr. Li's preparation for the second night of his deposition was seemingly somewhat better than the first, but Mr. Li was equally reluctant to discuss the records in any detail, or at all: Mr. Li testified that Feitian has records of all customers that came to Feitian through RF Ideas and that he reviewed those records, invoices and emails, but following the interpretation of his counsel's objection, refused to answer whether those records of sales made by RF Ideas in California or Delaware had been produced. [Li II at 30, ln. 4-15, 21-24; 31, ln. 1-33, ln. 13]. In making the objection, Feitian took the position that RF Ideas was not necessarily Feitian's agent when it made offers or sales of Feitian's products in the U.S., including in Delaware or California, and that communications regarding RF Ideas' efforts on behalf of Feitian, even those copied to Feitian, were beyond the scope of the limited jurisdictional discovery ordered by the Court. [Li II at 31, ln. 10-33, ln. 13].

In preparing for the second part of his deposition Mr. Li again spoke to Mr. Lui and also to one person in the marking department; the only information received from the marketing department about marketing in California was the "2006 RSA meeting information." [Li II 49, ln. 4-20; 50, ln. 1, 22].[16] Mr. Li testified that Feitian's sales records consist of invoices, purchase orders, emails and faxes, but that he did not find faxed documents of customers located in Delaware and that all the records of California customers were given to his counsel. [Li II at 17, ln. 13-24; 18, ln. 1; Li I at 49, ln. 7-17].[17] When asked for more information about the California contacts, Mr. Li said he did "not have the information to answer" questions regarding the events leading to these California sales. [Li II at 41, ln. 4-13; 42 ln, 20-24].

---

[16] Of course, Feitian attended that conference in prior years as well, but Mr. Li did not mention that fact during his alleged inquiry of the marketing department about Feitian's contacts with California, and Delaware.

[17] Although RF Ideas produced documents showing sales by Feitian to California that pre-date the institution of this action, [see, Ex. I], when Feitian responded to Aladdin's discovery requests, the only sales information and written communications identified by Feitian concerning its contacts with California were dated post-suit and were therefore meaningless for the determination of the personal jurisdiction issue in that forum. [See Ex. B (FT 00052-63 ].

15

Feitian's business is an online business. Its website offers "Software Developer Kits" of the infringing products for potential customers to evaluate:

> All Feitian products have complete Software Developer's Kits that include all the tools necessary for you to integrate software protection and security into your environment. If you are interested in evaluating our products, you may request and SDK simply by completing the evaluation form.

[D.I. 43 (Aladdin response), Ex. C (portions of Feitian's website); *see also,* D.I. 43 (Aladdin's response) Ex. E, ¶¶6, 8-10]. The sending of an SDK to a potential customer in Delaware or California is a contact with a resident; information about such contacts is significant in determining the issue of personal jurisdiction. Feitian's designee was not prepared to answer questions about this integral part of Feitian's business:

> Q.    Does Feitian ever give away free product to potential customers?
>
> A.    I'm not certain.

[Li II at 88, ln. 11-13]. Mr. Li then testified that he "did look, but "did not find any" information about Feitian's provision of any SDK to anyone in Delaware or California. [Li II at 88, ln. 14-18].

Feitian conducts its business primarily through electronic communications. [D.I. 43 (Aladdin response), Ex. E, ¶¶9, 10]. However, Feitian does not retain records that other similarly situated company's retain in the usual course of business. When John O'Mara, Cecile Stadler, May Wang and Rachel Liu, all Feitian employees involved in international sales, including the U.S. market, left Feitian's employ their computers were given to other Feitian employees; Feitian has no established procedure for retaining the prior employee's electronic files nor is there any objective criteria for determining what should be retained, only if "one found that information is

useful" did Feitian retain the records from these former employees. [Li II at 51, ln. 9-58, ln. 5; 61, ln.2-11].

Mr. Li tried to rehabilitate the impact of some of his testimony regarding Feitian's retention of significant business records, claiming that Aladdin had misunderstood his previous testimony that it only kept invoices for three months, stating, "…[T]he information was kept by the person who was in charge and after three month the information was moved to a folder which other people can also have access to." [Li II at 23, ln. 2-8]. When asked additional questions about the folder, Mr. Li would not amplify his testimony:

> Q.    Mr. Li, where did you find this document?
>
> A.    It's in the document folder.
>
> Q.    Whose document folder?
>
> A.    The folder which everyone has access to.
>
> Q.    But what information is kept in that folder?
>
> A.    It has nothing to do with this case.

[Li II at 87, ln. 15-21].

Mr. Li's responses to other questions about Feitian's records showed that this testimony about searching folders, meant to convey that Feitian maintained complete business records, was inaccurate:

> Q.    Did you check to see if Feitian has any records concerning shipments of product to Delaware of California in preparing for you deposition?
>
> A.    I looked, but I did not find any information.
>
> Q.    Where did you look?
>
> A.    I looked at all the information folders.
>
> Q.    …do you have shipping information folders?

17

> A.    Yes, the most recent one.
>
> Q.    …Well, for the information [2006 California sales] that you did produce you didn't produce any shipping information for them. Do you have shipping information for the sales…?
>
> A.    We do not have the shipping documents. We only have the document number, and we informed the customer…for them to get the product.
>
> Q.    How do you inform the customer of the number?
>
> A.    We make phone call or send the email.
>
> Q.    …did you look to see whether there were any e-mails between Feitian and [the 2006 California customers].
>
> A.    I did not find.

[Li II at 88, ln. 14-89, ln. 22].

Mr. Li's description of the contents of the "document" or "information" folders did not establish that they contained the universe of Feitian's business information concerning offers for sale or sales to Delaware or California:

> Q.    When you say you looked in all the files, please describe what files you looked in.
>
> A.    Meaning the folders to put the documents in.
>
> Q.    What folders?
>
> A.    It is the folders which relate to customers' information.
>
> Q.    That customer information, how many years does it cover?
>
> A.    Only important information which I think I need to keep ALL the information is in the folder.

[Li II at 22, 7-16].

Despite his testimony on each night's deposition concerning the dearth of business records maintained by Feitian in the normal course of business, Mr. Li had no problem testifying unequivocally that he had looked through all Feitian's business records from October 1999 to

18

present concerning sales or communications from or to Feitian and Delaware and California and had produced everything found to his attorney. [Li I at 30, ln. 15-18; Li II at 23, ln. 9-15]. For the reasons set forth above concerning the volume of materials produced by RF Ideas, this testimony is not credible and should be disregarded. [*See, e.g.,* Ex. I].

Further, Mr. Li testified that Feitian does not have records showing revenues from California and does not track revenues generated due to sales in the United States. [Li II at 25, ln. 11-24]. This testimony is belied by information given by Feitian to Dun & Bradstreet, ("annual sales (US) $1,449,600"; "Export Volume (2000): USD 300,000"; as well as Feitian's newsletters ("Feitian has "customers in 50 countries including the USA"); and emails to its distributors ("we are making steady progress in U.S. sales"). [D.I. 43 (Aladdin response), Ex. F; Ex. A, Ex. 1, Ex. E, Ex. 3].

The fact that Feitian does not have complete records to review concerning its U.S. sales, including sales to California and Delaware, completely undermines its assertions to this Court that it has no contacts with Delaware and that its contacts with California are limited to a few post-suit sales and attendance at the 2003, 2005 and 2006 RSA Conference.[18]

### (b)    Feitian's responses to written discovery requests

Feitian's lack of good faith cooperation with jurisdictional discovery is also apparent in the type of responses it provided to Aladdin's written discovery requests regarding its California contacts.[19]   For example, Feitian had no difficulty making blanket denials concerning its

---

[18] Feitian's contention that its attendance at these conferences was purely for "the exchange of technology" and not for the purpose of generating revenue for Feitian is not credible. [See, Li II at 71, ln. 6-72, ln. 2, 81, ln. 1-24].

[19] Even in asserting that it has no contacts with Delaware, Feitian has not engaged in any meaningful investigation to determine that its statements are accurate. As discussed above, no documents were reviewed in preparing the Declaration that Feitian has no contacts with Delaware and the signer, Zhao Wengwang, did not draft it. [Ex. F, No. 25; Ex. D, Nos. 19-21. Although claiming that all inquiries received about its products from Delaware were generated by Aladdin's counsel, when asked what information it possessed or investigation it had made to determine that the inquiry made by John Sloan was related to Aladdin's counsel, Feitian admitted it had no information and

19

contacts with Delaware, but carefully evaded full disclosure in discussing its contacts with California. This tactic is reflected in the response to Aladdin's request for admissions No. 10. In that response, Feitian "denies it is subject to jurisdiction in Delaware. Feitian admits is has transacted business in the State of California but can neither admit nor deny whether these transactions would be sufficient to subject it to jurisdiction in the State of California." [Ex. D, No. 10; *see also*, *id.*, No. 1].

Feitian admitted it has made sales to California and that when making sales "the documents it would generate would be a pro forma invoice to the purchaser....Feitian would also email the customer informing it of the shipment and the DHL tracking number," and stated that "Feitian will produce documents from which the answer to the Interrogatory may be obtained with respect to California" as to inquiries, sales or offers for sale of the infringing products in California. [*See* Ex. F, Nos. 4, 5, 19-24].

Notwithstanding this response, Feitian produced in total only one e-mail, six invoices, three purchase orders and a contract for a booth rental at the 2006 RSA Conference in San Jose, California. Conveniently all of these few documents were dated after the institution of this suit. [*See* Ex. B (FT 00063 (email); FT 0053-54 (booth contract); FT 00055, FT 00057 and FT 00060 (purchase orders); FT 00052, FT 00056, FT 00058, FT 00059, FT 00061, FT 00062 (invoices)]. The Court may infer that the fact caselaw provides that only contacts prior to the institution of suit may be considered in determining personal jurisdiction as the reason that Feitian's document production contained no pre-suit communication with California. *See Mateer v. Interocean American Shipping Corp.*, 2006 WL 997248, *8 (N.D. Ca. April 17, 2006) (Slip Copy), *citing*

---

had made no inquiry or investigation. [Feitian Technologies Co., Ltd.'s and RS-Computer's Amended Responses to Plaintiff's Second Set of Interrogatories on Jurisdictional Issues, attached as Exhibit "J," Nos. 3-5].

*Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 913 (9th Cir. 1990) ("The only contacts that matter are those existing at or before the beginning of the litigation").[20]

### (c)     Jurisdiction is warranted under Rule 4(k)(2) in these circumstances.

Gaining inroads into the North American market was a significant strategic business goal for Feitian. As early as January 2, 2003 Feitian advised that "[t]he U.S. is Feitian's most strategic nation, other than China." [*See* 1/2/03 Feitian email to RF Ideas, attached as Exhibit "L"; *see also* D.I. 43, Ex. E, ¶11 and Ex. 3]. In January 2003, Feitian discussed its goal of opening an office in the U.S. "in the next three to five years." [*See* 1/16/03 email from Feitian to RF Ideas, attached as Exhibit "M"]. Obtaining a distributor for its products in North America was part of accomplishing that strategic goal; the "Territory" granted to RF Ideas in its Distribution Agreement with Feitian is "Canada and the United States of America." [D.I. 43, Ex. E, ¶4; Ex. B, Ex. F (FT 00039)]. The exact scope of those inroads is information Feitian refuses to provide.

Fed.R.Civ.P. 4(k)(2), adopted in 1993, provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant *who is not subject to the jurisdiction of the courts of general jurisdiction of any state*." (Emphasis added).

The federal long-arm statute is used in cases involving alien defendants. "Rule 4(k)(2)...sanctions personal jurisdiction over foreign defendants for claims arising under federal

---

[20] That Feitian did make pre-suit sales and offers of sale to California residents and did directly communicate with California residents is evident from the documents produced by RF Ideas, Feitian's U.S. Distributor. [*See* Ex. I]. Feitian passed leads to RF Ideas concerning possible California customers. [*See, e.g.,* Ex. I, 11/7/03, 12/8/03 Feitian emails]. This evidence directly contradicts Mr. Li's denial that Feitian passed on leads (continued on next page) concerning possible California business to RF Ideas. [Ex. H, Li II at 36, ln. 1-6]. In addition, Feitian admits that it attended the RSA Conference in San Francisco, California in 2003, 2005 and 2006. Feitian Technologies Co., Ltd.'s Second Amended Responses to Plaintiff's Request for Admissions attached as Exhibit "K," Nos. 16-18; 20-22; 24-26].

21

law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state." *BP Chemical Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254, 258 (3d Cir. 2000). Patent infringement claims arise under federal law and therefore Rule 4(k)(2) is applicable. *Telecordia Technologies, Inc. v. Alcatel S.A.*, 2005 WL 1268061, *4 (D. Del. May 27, 2005).

Aladdin has information that Feitian offered for sale and sold products that infringe upon Aladdin's patents in the United States. [D.I. 43 (Aladdin's response), Ex. A, ¶¶ 18-22]. As discussed above, although admitting U.S. contacts while denying Delaware contacts, Feitian refused each invitation to identify an appropriate forum for transfer, and, as detailed above, when forced to identify contacts with another jurisdiction, California, provided exclusively information that it knew could not be considered in determining the existence of jurisdiction. Although not yet addressed by the Third Circuit, other circuit courts have held that this refusal operates to release a plaintiff from having to establish the "negation requirement" of Rule 4(k)(2), that is, from having to show that Feitian is not subject to personal jurisdiction in any single state:

> A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed…If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)…This procedure makes it unnecessary to traipse through the 50 states, asking whether each could entertain the suit.

*ISI International, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001); *accord*, *Mwani v. Bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005). Thus, having met the first two prongs of Rule 4(k)(2) jurisdiction, Aladdin then attempted to establish the third prong through jurisdictional discovery on Feitian's nationwide contacts to determine if it has sufficient contacts

22

with the U.S. as a whole to satisfy the Fourteenth Amendment's Due Process requirement. *BP Chemicals v. Formosa Chemical and Fibre*, 229 F.3d at 258-59. As is set forth above, the Court denied the request for discovery of all Feitian's U.S. contacts, but allowed discovery as to its contacts with California.

Based upon the information provided by Feitian in jurisdictional discovery, the following can be shown: Feitian does business in the U.S.; after this suit was filed Feitian did business in California; Feitian had a distribution channel in the U.S. before this suit was filed through RF Ideas, a Delaware corporation. This is the sum of the information obtained through Feitian's cooperation in jurisdictional discovery. This information is sufficient to warrant a finding that Feitian conducts business in the U.S., but nowhere in a sufficient amount to authorize the imposition of jurisdiction under the long arm statute of any particular state. These peculiar facts therefore give rise to a basis to impose jurisdiction in this judicial district under Rule 4(k)(2). Aladdin should not, on this record, despite this District Court's holdings on the parties' relative burden of proof on this issue, be required to show more. *See Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp.2d 636, 647 (D. Del. 2006) (Court found that it did not have to conduct a Rule 4(k)(2) analysis beyond "the first step" since the plaintiff did "not satisfy its burden of proving the lack of state-specific contacts"); *Telcordia v. Alcatel S.A.*, 2005 WL 1268061, *5 (D. Del. May 27, 2005) (Court agreed with those "district courts of the Third Circuit [which] have addressed the negation requirement and concluded that the plaintiff bears the burden of demonstrating that the defendant is not subject to jurisdiction in any state."). Accordingly, Aladdin requests that the Court enter an order denying Feitian's motion to dismiss with prejudice based upon the Court's authority to exercise personal jurisdiction over Feitian pursuant to Fed.R.Civ.P. 4(k)(2).

**B.** **In The Alternative, This Action Should Not Be Dismissed, But Should Be Transferred To The U.S. District Court For The Northern District Of Illinois Where It Could Initially Have Been Brought Pursuant To 28 U.S.C. §1631, And In Accordance With 28 U.S.C. § 1404(a) Criteria**

In conducting its jurisdictional discovery, Aladdin believed that it would be able to meet the third prong of Rule 4(k)(2) and, if it merely obtained Feitian's discovery responses and relied on them, for this submission, it would plainly succeed. However, Aladdin also obtained documents from RF Ideas. Mindful of this Court's decisions holding that: (a) Rule 4(k)(2) jurisdiction only applies if the defendant lacks sufficient contacts with any state to subject it to personal jurisdiction; and, (b) it is the plaintiff's burden of proving the lack of state-specific contacts, Aladdin is also submitting evidence of Feitian's contacts with Illinois sufficient to subject it to personal jurisdiction in that forum. *See Monsanto,* 443 F. Supp.2d at 647; *Telecordia*, 2005 WL 1268061 at *5.

Therefore, in the alternative, if the Court finds that Feitian's contacts with Illinois establish the minimum contacts required by the Illinois long arm statute, are consistent with due process; and that it would be fair and reasonable to require Feitian to litigate Aladdin's claims there, then in interest of the justice the Court should transfer this action to the U.S. District Court for the Northern District of Illinois. If, however, the Court does not believe that Aladdin has established a basis for a finding that it could have initially instituted suit in that jurisdiction, then in the interest of justice the matter should remain here, with the Court exercising jurisdiction pursuant to the "federal long arm statute," Rule 4(k)(2).

1.    **Facts obtained during jurisdictional discovery from third parties reflect that the matter could have been filed in the Northern District of Illinois warranting transfer there in the interest of justice as an alternative to dismissal.**

If the Court finds that jurisdiction is lacking here but that the matter initially may have been filed in the Northern District of Illinois then, rather than dismissing this action, the Court should enter an order transferring it pursuant to 28 U.S.C. § 1631. Under 28 U.S.C. § 1631,

> [w]henever a civil action is filed in a court as defined in section 610 of this title...and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action...to any other such court in which the action or appeal could have been brought at the time it was filed...and the action...shall proceed as if it had been filed in...the court to which it is transferred on the date upon which it was actually filed in... the court from which it is transferred.[21]

Illinois' long arm statute, 735 ILCS 5/2-209, permits service of process to the limits of the due process clause of the federal Constitution. *Hyatt International Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002) ("[T]here is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction."). "The Illinois Constitution contains its own guarantee of due process to all persons (Ill. Const. 1970, art. I, § 2), a guarantee which stands separate and independent from the Federal guarantee of due process." *Rollins v. Ellwood*, 565 N.E.2d 1302, 1316 (1990).

Section 2-209(a), in pertinent part, authorizes jurisdiction arising from the doing of any such acts:

(1)    The transaction of any business within this State;

(2)    The commission of a tortious act within this State;

---

[21] 28 U.S.C. § 610's definition of "courts" includes "district courts of the United States."

(7)    The making or performance of any contract or promise substantially connected with this State.

### (a)    ILCS 5/2-209(c)

The Illinois long arm statute also has a "catch-all" provision set forth in § 2-209(c), 735 ILCS 5/2-209(c) (West 2002): "A court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." This section provides an independent basis for asserting personal jurisdiction over a defendant. *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 827 N.E.2d 1031, 1036 (2005). Therefore, where the contacts between an out-of-state defendant and an Illinois plaintiff satisfy both federal and state due process concerns, the requirements of the long-arm statute have been met and no other inquiry, *i.e.,* whether the defendant did any of the acts enumerated in sections 2-209(a)(1) through (a)(14), is required. *Id.* Although jurisdiction over Feitian in the Northern District of Illinois would comport with federal and state due process concerns under § 2-209(c) and no further analysis is required, for the reasons set forth below, Feitian's contacts with Illinois are also sufficient to render it subject to jurisdiction under § 2-209(a)(1), (2) and (7) of the Illinois long arm statute.

### (b)    ILCS 5/2-209(a)(7)

The principal place of business of RF Ideas is Arlington Heights, Illinois. [*See* D.I. 43 (Aladdin's response), Ex. E, ¶3]. Feitian negotiated at least four contracts relating to the infringing products with RF Ideas in Illinois. This was accomplished by electronic mail and telephone. These contacts were:

(1) a March 11, 2003 Distribution Agreement for ePass, an infringing product. [*See* Ex. B (FT 00038-44); Ex. L];

26

(2) a March 11, 2003 Distribution Agreement for Rockey, an infringing product; a Contract to Lease Distributor's Coding System dated March 10, 2003 ("Coding Contract") [*see* Ex. B (FT 00045-46); the Distribution Agreement (Rockey), and Feitian/RF Ideas' emails related to the Coding Contract and Distribution Agreements, attached as Exhibit "N"]; and

(3) a Distributor's Coding Program License Agreement dated July 26, 2004, attached as Exhibit "O."

Each contract contained RF Ideas' Arlington Heights, Illinois address and each was executed in Arlington Heights, Illinois on behalf of RF Ideas and sent to Feitian.[22] [*See* Declaration of Rick Landuyt, attached as Exhibit "P," ¶¶2-6].[23] Pursuant to the Coding Contract, RF Ideas leased equipment from Feitian that was used in coding passwords and customer codes for Feitian's infringing Rockey products. [*See* Ex. B, Coding Contract, Whereas clause and § 1.0]. Feitian shipped the leased equipment to RF Ideas in Arlington Heights, Illinois, following RF Ideas' initial wire transfer of $1,000 to Feitian from RF Ideas' bank in Illinois. [*See* Coding Contract, at §1.0; Feitian's 5/26/04 email, attached as Exhibit "Q"].

When RF Ideas announced it was terminating its relationship with Feitian, the Notice to Terminate Distribution Agreement dated September 14, 2005 was sent to RF Ideas in Illinois and RF Ideas returned the equipment to Feitian.  [*See* Ex. B (FT 00047); Feitian's 8/29/05, 9/12/05 emails, attached as Exhibit "R"].

Feitian sent RF Ideas distributor price lists for ePass and Rockey, the infringing products. [*See* Ex. B (FT 00049)].  Feitian placed telephone calls to RF Ideas in Illinois to discuss the

---

[22] Feitian only produced two of the four contracts in response to Aladdin's discovery.

[23] Aladdin cannot quote extensively from the documents produced by RF Ideas due to RF Ideas' view that the documents are confidential and proprietary business information subject to the Stipulated Protective Order. [Ex. P, ¶14].  Aladdin is filing exhibits under seal attaching some of the documents produced by RF Ideas that are relevant to the jurisdiction issue.  RF Ideas does business as "Security Tokens," and therefore Feitian frequently referred to RF Ideas as Security Tokens in its communications.  Aladdin believes that the Court will find these documents to be informative.

parties' Distribution Agreement. [*See* Ex. P, ¶6; Feitian/RF Ideas' 9/18/03, 9/26/03, 5/25/05

emails, attached as Exhibit "S"].

These acts are sufficient to render Feitian subject to personal jurisdiction under § 2-

209(a)(7). *Commerce Trust Co. v. Air 1st Aviation Companies, Inc.*, 851 N.E.2d 131, 144-45 (Ill.

App. Ct. 2006) (Defendant could reasonably expect to be haled into court in Illinois when

defendant "communicated with [resident] in Illinois before entering into the agreement; knew it

was entering into the agreement with an Illinois resident because the agreement listed [the

resident's] Illinois address...knew it had to submit offers to Illinois; [and] knew it had to

communicate with Illinois to get the balance due under the contract...Despite knowing all this,

[defendant] still chose to enter into a continuing relationship with an Illinois resident. It

purposefully established minimum contacts with Illinois and it should be no surprise that it is

now being sued in Illinois.").

(c)    ILCS 5/2-209(a)(1)

Feitian also transacted business in Illinois within the meaning of § 2-209(a)(1) of the

Illinois long arm statute. "Section 2-209 requires only that the cause of action "lie in the wake"

of the transaction of business." *Jacobs/Kahan & Co. v. Marsh*, 740 F.2d 587, 591 (7th Cir.

1984).

RF Ideas wired funds from Illinois in payment of infringing products to Feitian in

accordance with Feitian's instructions. [*See* Ex. P, ¶8; Ex. L; Feitian/RF Ideas' 2/17/04, 8/9/04,

10/20/05 emails and RF Ideas' 2/23/04 wire transfer, attached as Exhibit "T"]. Feitian directed

RF Ideas' actions in Illinois in distributing the infringing products:

(1)    Feitian discussed its "marketing efforts on the Internet" with RF Ideas and

advised that it had added

28

a Distributor section to our website where your company is listed along
with a link to your website. It will make it easier for potential customers
to get in touch with you. Your listing currently has only a flag
representing the country that corresponds to your territory. We would like
to add your company logo to this page as well. Please send us your logo
in .jpg..format.

[Feitian 11/5/03 email; *see also*, Feitian 12/9/03 email, attached as Exhibit "U"];

(2)    Feitian reviewed RF Ideas' website and sent it Feitian's infringing product
logos and its company logo, instructing RF Ideas to "add the company logo to your
website along with a link to www.Ftsafe.com [*Id.*][24];

(3)    In November 2004, Feitian sent an email to its distributors about the
possibility of implementing "a cross-linking program as part of the whole site redesign,"
but advised that it was pulling "all distributor content information off our website" in part
because "we have heard some unofficial rumors that Aladdin is thinking about taking
some sort of legal action against Feitian (in the USA…)…Obviously, we will continue to
pass all leads to you as appropriate." [Feitian 11/18/04 email, attached as Exhibit "V"].

(4) Feitian advised RF Ideas that it had a six month run scheduled in C++
Magazine and directed RF Ideas to notify Feitian of all contacts received through C++
Magazine so that it could "track the effectiveness of the magazine." [*See* Ex. M];

(5) Feitian requested that RF Ideas provide sales projections, and monthly reports
of the inquiries received about ePass, an infringing product. [*See* Feitian's 12/4/03,
7/1/04 emails, attached as Exhibit "W"]; and

(6) Feitian requested that RF Ideas join it at the RSA Conference in San
Francisco, CA. [*See* Feitian 3/13/03 email, attached as Exhibit "X"].

---

[24] The Court should contrast the information in this email with Feitian's response to Aladdin's discovery requests in
which it stated that it "is not aware of any websites that had a hyperlink from or to its website." [*See* Ex. C, No. 2].

29

From August 2003 through May 2005, RF Ideas sold and offered for sale Feitian's infringing products pursuant to the parties' Distribution Agreements. [*See* customer/sales chart, attached as Exhibit "Y"; sales analysis report, detail report, invoices, purchase orders, packing lists and related Feitian/RF Ideas' emails, attached as Exhibit "Z"]. Feitian forwarded leads to RF Ideas in Illinois and urged U.S. customers to contact RF Ideas in Illinois, "our…distributor in North America," "our U.S. distributor". [*See, e.g.,* Feitian emails to RF Ideas, forwarding leads, attached as Exhibit "AA"].[25]

Feitian forwarded U.S. leads to RF Ideas that had been developed by its Malaysian distributor, former defendant Softkey e-Solution Bdn. [*See* 9/28/04 Feitian email, attached as Exhibit "DD"]. Potential customers contacted RF Ideas in Illinois at Feitian's prompting. [*See* 1/5/04, 1/12/04 emails, attached as Exhibit "EE"].

The Distribution Agreement required RF Ideas to keep infringing products in stock and RF Ideas purchased infringing products for this purpose; Feitian also sent RF Ideas free Software Developer Kits for the infringing products. [Ex. C (FT 00038-44) at §§5.5, 8.1; *See* Feitian 1/21/03, 8/5/03 emails, Invoice #030314, attached as Exhibit "FF"].

Feitian shipped infringing products directly to RF Ideas in Arlington Heights, Illinois, Chicago, Illinois and occasionally Cary, Illinois for RF Ideas' use or for its reshipment to the ultimate purchaser. [*See, e.g.,* invoices, purchase orders, Feitian emails reflecting shipments to RF Ideas in Illinois, attached as Exhibit "GG"; *see* also, Ex. P, ¶7]. RF Ideas followed up on Feitian's leads and shipped infringing products from its offices in Arlington Heights, Illinois. [*See* Ex. GG; Ex. P, ¶¶7-8]. RF Ideas' distributed Feitian's infringing products to other residents

---

[25] In June 2004, Feitian notified RF Ideas that "ePass has another distributor in North America: AZ-Tech Software". [*See* Feitian 6/28/04 email, attached as Exhibit "BB"]. Thereafter, in responding to inquiries from U.S. residents about its products, Feitian requested follow up with either of its U.S. distributors, RF Ideas/Security Tokens or AZ-Tech Software. [*See, e.g.,* Feitian emails to customers with contact information for Feitian's U.S. distributors, attached as Exhibit "CC"].

of Illinois. [*See* Ex. P, ¶7; invoices, purchase orders, packing lists, emails reflecting RF Ideas'

sales of Feitian's infringing products to Illinois residents, attached as Exhibit "HH]. RF Ideas

shipped defective or unwanted inventory to Feitian from Arlington Heights, Illinois. [*See*

12/16/05 packing list, 6/22/05 email, return authorization form and return chart, attached as

Exhibit "II"].

Revenue information produced by RF Ideas shows that prior to Aladdin's suit it had

revenues at least in excess of $66,000 for sales of Feitian's infringing products and related

services [*See* Ex. Y; Ex. Z; Ex. P, ¶5]. The amount of sales is not dispositive, however, because

the Illinois long arm statute does not require significant sales or revenues before a court may find

sufficient minimum contacts to warrant the exercise of personal jurisdiction. In *Blistex Inc. v.*

*Circle Laboratories, Inc.*, 2000 WL 1154635, *3 (N.D. Illinois Aug. 15, 2000) (Memorandum

and Opinion), the court held:

> [A]ctual sales to Illinois residents need not be significant. When the cause
> of action at issue 'arises out of or relates to' the defendant's contacts, a
> court may properly assert personal jurisdiction, even if those contacts are
> 'isolated and sporadic'…In fact, 'even a single act can support
> jurisdiction,' so long as it creates a 'substantial connection' with the
> forum, as opposed to an 'attenuated affiliation.' (Internal citations
> omitted).

The courts in Illinois continue not to view significant revenue as a requirement for a

finding that a defendant purposefully engages in business in Illinois. *See School Stuff, Inc. v.*

*School Stuff, Inc.*, 2001 WL 558050, *3 (N.D. Ill. May 21, 2001) (Memorandum and Opinion)

(online sales of $447.09 sufficient to establish "the minimum contacts with Illinois to satisfy the

due process inquiry. By choosing to do business in Illinois, the defendant purposefully availed

itself of the privilege of conducting activities in Illinois and therefore, should reasonably

anticipate being haled into court in Illinois."); *see also, Commerce Trust Co. v. Air 1st Aviation*

*Companies, Inc.*, 851 N.E.2d 131, 144 (Ill. App. Ct. 2006) (finding significant activities where

31

defendant entered into a business relationship with an Illinois resident and entered into an agreement with the resident; at least six calls placed from defendant to Illinois, continued dealing with Illinois resident, calling, submitting offers to him in Illinois, receiving monies from him in Illinois.)

A state has an interest in discouraging injuries that occur within the state; "[t]hat interest extends to design patent infringement actions...." *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1568 (Fed. Cir. 1994). Where, as here, the allegations are that the defendants "purposefully shipped the accused [infringing product] into [the forum] through an established distribution channel, the cause of action for patent infringement is alleged to arise out of these activities. No more is usually required to establish specific jurisdiction." (Citations omitted)." *Beverly Hills Fan*, 21 F.3d at 1565. "[T]here is no requirement that the non-resident be on notice that a specific type of litigation might ensue." *Id.* at 1565 n.4. Further, the fact that "the owner of the intellectual property at issue...was [not] a resident of the forum...is not a determinative distinction...." *Id.* at 1567, *quoting Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779-80 (1984). Here, offers of sale and sales of Feitian's infringing products occurred in Illinois. Aladdin's cause of action therefore lies in the wake of Feitian's business activities in Illinois.

**(d)     ILCS 5/2-209(a)(2)**

In addition to the above sections, § 2-209(a)(2) of the Illinois long arm statute supports the exercise of jurisdiction over Feitian by the Northern District of Illinois. The issue of the site of the tortious act of a patent infringement has been addressed by the Federal Circuit:

> A patent is a federally created property right, valid throughout the United States. Its legal situs would seem to be anywhere it is called into play. This point is illustrated by the fact that, when an infringement occurs by a

sale of an infringing product, the right to exclude is violated at the situs where the sale occurs.

*Beverly Hills Fan*, 21 F.3d at 1570. The court set out its reasoning in determining that the place of the infringing sales is the situs of the injury:

> Economic loss occurs to the patent holder at the place where the infringing sale is made because the patent owner loses business there. This loss is immediate when the patent holder is marketing a competing product....Furthermore, analysis of long-arm jurisdiction has its focus on the conduct of the defendant...Additionally, a focus on the place where the infringing sales are made is consistent with other areas of intellectual property law-it brings patent infringement actions in line with the rule applied in trademark and copyright cases...Accordingly, we hold that, in a case such as this, the situs of the injury is the location, or locations, at which the infringing activity directly impacts on the interests of the patentee, here the place of the infringing sales....

*Id.* at 1571.

Following the Federal Circuit's direction, the Northern District of Illinois has found that the sale of infringing products to a distributor in Illinois "constitutes the 'commission of a tort' in Illinois under section 2-209(a)(2) of Illinois' long-arm statute." *Gummow v. Superior Ratchet and Tool Co.*, 1997 WL 374406, *4 (N.D. Ill. June 20, 1997), *citing North Am. Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994).

Once a plaintiff has shown the existence of defendant's purposeful minimum contacts with the forum, the burden shifts to the defendant to convince the court that the exercise of jurisdiction over it in not "reasonable and fair." *Inamed Corp. v. Kuzmak*, 249 F. 3d 1356, 1363 (Fed. Cir. 2001). This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendants to litigation within the forum. *See Beverly Hills Fan*, 21 F.3d at 1568.

33

Feitian has not made any showing that this is one of those "rare cases" in which the exercise of jurisdiction would not be fair or reasonable. *Asahi Metal Indust. Co. v. Superior Court*, 480 U.S. 102, 116 (1987). Such cases are generally "limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum. *See Burger King*, 471 U.S. at 477…(must be 'compelling case' of unreasonableness); *Keeton*, 465 U.S. at 774-75…(purposeful minimum contacts 'ordinarily' enough)." *Beverly Hills Fan*, 21 F.3d at 1568.

In determining whether it would be reasonable to require a foreign defendant to litigate in the forum state, the courts use five factors to guide their inquiry:

> (1) the burden on the defendant to defend the action in the forum state; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the action; (5) the shared interests of the several states in advancing fundamental social policies.

*Viktron Ltd. Partnership* v. *Program Data, Inc.*, 759 N.E.2d 186, 198, (Ill. 2001), *citing World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

Consideration of this "five factor guide" supports a finding that it would be fair and reasonable to compel Feitian to litigate in Illinois. Feitian is located in China, the burden on it in litigating anywhere in the United States is essentially the same; Aladdin has an interest in protecting its patents; federal law is applied regardless of the jurisdiction. In addition, as is set forth above, Illinois plainly has a substantial interest in discouraging patent infringement injuries in the state and "progress in communications and transportation" have made "the defense of a lawsuit in a foreign tribunal less burdensome." *Beverly Hills Fan* 21 F.3d at 1569.

34

**2.    Transfer comports with the "interest of justice" requirement of 28 U.S.C. § 1631.**

Under § 1631, the only factor that the court need consider in determining whether to transfer a matter to a jurisdiction where it could have been brought is whether it is "in the interest of justice." The court can transfer an action in the interest of justice pursuant to this section even in the absence of a motion for transfer by any party. *See Blizzard v. FCI Elkton*, 2006 WL 2934826, *4-5 (E.D. Pa. Oct. 12, 2006) (Slip Copy).

Transfer where jurisdiction and venue are proper in another forum is in the interest of justice. Dismissal would be "'time-consuming and justice-defeating'", whereas transfer has the benefit of serving "the Court's interests in judicial economy...by obviating the need for plaintiff to refile his claim" in the transferee forum. *Blackwell v. Marina Associates*, 2006 WL 573793, *7 (E.D. Pa. March 9, 2006) (citing cases).

Aladdin has established on this record that it could have filed suit against Feitian in Illinois because venue is proper there pursuant to 28 U.S.C. § 1391(d) and personal jurisdiction over Feitian is consistent with the exercise of due process under the long arm statute of Illinois.[26] Therefore, a transfer would remove unnecessary jurisdictional disputes between the parties going forward, which would promote judicial economy as well as serve the interests of justice, all public policy factors militating in favor of the transfer. *See Mentor Graphics Corp. v. Quickturn Design Systems, Inc.*, 77 F. Supp.2d 505, 512, 513 (D. Del. 1999).

**3.    Transfer is also appropriate under 28 U.S.C. § 1404(a) factors.**

Transfer rather than dismissal serves the interest of justice in this case and no further analysis is required for a transfer under 28 U.S.C. §1631. However, even under an analysis of

---

[26] Pursuant to 28 U.S.C. § 1391(d), an "alien may be sued in any district."

35

the factors to be considered when a party moves for a transfer, Aladdin has established a basis on this record for transferring the matter.

28 U.S.C. §§ 1404(a) and 1406(a) also govern the transfer of actions pursuant to a motion. "Whether section 1404(a) or section 1406(a) governs is dependent upon whether there was proper venue in the district in which the plaintiff originally bought the action. When venue exists in the district in which the case was originally filed, section 1404(a) applies; when venue never existed in the district where the suit was filed, section 1406(a) governs." *FS Photo Inc. v. Picturevision, Inc.*, 48 F. Supp.2d 442, 449 (D. Del. 1999), *citing Van Dusen v. Barrack*, 376 U.S. 612, 634 (1964).

The "Third Circuit has found § 1404(a), and not § 1406(a), to be the proper basis of transfer where venue is proper but personal jurisdiction is lacking." *U.S. v. Berkowitz*, 328 F.2d 358, 360 (3d Cir.), *cert. denied*, 379 U.S. 821 (1964)." *Weber v. McDonald's System of Europe, Inc.*, 660 F. Supp. 10, 13 (D. Del. 1985). Because Feitian is an alien which could be sued in any district, venue is proper both in this Court and in the Northern District of Illinois. Accordingly, the Court may analyze the appropriateness of transfer under § 1404(a).

28 U.S.C. § 1404(a) provides that "[f]or the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." "The burden of establishing the need for transfer still rests with the movant." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). Once a district court in Delaware determines that the lawsuit could have been initially filed in another forum, it moves "on with the inquiry as directed by the Third Circuit's decision in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995)." *Motorola Inc. v. Pc-Tel, Inc.*, 58 F. Supp.2d 349, 357 (D. Del. 1999).

36

In *Jumara,* 55 F.3d at 879, the Third Circuit noted that in deciding § 1404(a) motions, while "there is no definitive formula or list of the factors to consider (citation omitted), courts have considered many of the private and public interests protected by the language of § 1404(a)." The Third Circuit enumerated the various "private interests" and "public interests" the courts, and commentators, have viewed as meaningful to the consideration of § 1404(a) motions. The "private interests" include:

> [P]laintiff's preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated in their relative physical and financial condition; the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the located of books and records...to the extent that the files could not be produced in the alternative forum.

*Jumara,* 55 F.3d at 879.  (Internal citations omitted).

The "public interests" include:

> [T]he enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases.

*Jumara*, 55 F.3d at 879-80.  (Internal citations omitted).

Most of the enumerated interests, private and public, are not applicable to this action. Both parties are foreign corporations and the physical proximity and expense involved in litigating this action in Delaware or Illinois is approximately the same, with Illinois being negligibly closer for Feitian.  Feitian's principal counsel is located in Houston, Texas.  In such circumstances, "travel is inevitable" and "the Court cannot conclude that the proximity of the Philadelphia Airport [to China/Texas] versus the proximity of [Chicago's O'Hare Airport to China/Texas] is sufficient to tip the balance in favor of maintaining the action in Delaware."

37

*APV North America, Inv. v. Sig Simonazzi North America, Inc.*, 295 F. Supp.2d 393, 399 (D. Del. 2002).

The corporate witnesses and records for Feitian and Aladdin are not located in either Delaware or Illinois. However, the employees of RF Ideas, Feitian's U.S. distributor for the infringing products, who are principal witnesses for Aladdin to establish Feitian's sales and offers for sale in the U.S. of infringing products, are located in Illinois outside the subpoena power of this Court, as are the records of RF Ideas, a factor favoring transfer to Illinois.[27] *See APV North America, Inv. v. Sig Simonazzi North America, Inc.*, 295 F. Supp.2d 393, 399 (D. Del. 2002) (Fact that "many of the relevant witnesses and documents are already available" in transferee state, "favors a transfer of this action" to that state).[28]

Because the matter involves federal patent law, the applicable law is the same in any federal district court and thus is not a determinative factor. As to preferences, Feitian has refused to state a preference for a jurisdiction, while Aladdin is now requesting that as an alternative to dismissal that the matter be transferred to Illinois, thus weighing that factor in Aladdin's favor. *See Zeigler v. Dart Industries*, 383 F. Supp. 362, 365 n.3 (D. Del. 1974) (Although the original choice of forum was plaintiff's, it is not precluded from moving to transfer under § 1404(a)).

Assuming that it is true that no sales or offers for sale of the infringing products were made in Delaware, Delaware's public policy concerns about protecting its residents from the effects of infringers is not implicated. However, Aladdin has established offers for sale and sales of products to residents of Illinois and thus that state's public policy considerations are

---

[27] RF Ideas' current and former employees involved in the negotiation of the Distribution Agreement and with responsibility for RF Ideas' execution of its obligations under the contract are all residents of Illinois, making that location most convenient for them. [See Ex. P, ¶¶9-13].

[28] In any event, less of a showing of inconvenience is needed for a § 1404(a) transfer than that for a *forum non conveniens* dismissal. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253 (1981).

implicated. *See Gummow v. Superior Ratchet and Tool Co.*, 1997 WL 374406, *4 (N.D. Ill. June 20, 1997) (Sale of infringing products to distributor in Illinois "constitutes the 'commission of a tort' in Illinois under section 2-209(a)(2) of Illinois' long-arm statute.").

There are public interest factors that weigh in favor of transferring the case rather than dismissing it. Feitian was properly served through the Hague Convention, an effort that took time and caused Aladdin to incur expense. Feitian has not been forthright in its responses to jurisdictional discovery and plainly wants to delay litigating the merits of Aladdin's claim, a result guaranteed if the action is dismissed rather than transferred to an appropriate forum.

Although not dispositive since Aladdin is requesting the transfer in the interest of justice as an alternative to outright dismissal, a review of the relative congestion of the dockets in Illinois and Delaware shows that the Northern District of Illinois docket moves slightly faster than Delaware's. The most recent statistics, for U.S. District Courts-Median Time Intervals from Filing to Disposition of Civil Cases Terminated by District and Method of Disposition During the 12-Month Period Ending September 30, 2005, provide that the median time intervals in months for disposition of civil cases in this Court is 26.5 months and 24.7 months for the N.D. of Illinois. [*See* Federal Courts Management Statistics, Table C-5, www.uscourts.gov/judbus2005, attached as Exhibit "JJ"].[29]

The "decision to transfer a case is subject to the court's discretion." *Mentor Graphics Corp. v. Quickturn Design Systems, Inc.*, 77 F. Supp.2d 505, 509 (D. Del. 1999). Where, as here, the available record indicates that no party maintains any facilities, personnel, or documents in Delaware, no acts of alleged infringement have taken place in Delaware, no relevant third-party witnesses reside in Delaware, the case is in the early stages of litigation, and there is no evidence of any great disparity in court congestion, "the public and private interests are sufficient to tip the

---

[29] The median disposition time in the N.D. of California is 26.0 months.

balance of convenience strongly in favor of transfer." *Ricoh Co., Ltd. v. Aeroflex Inc.*, 279 F.

Supp.2d 554, 558 (D. Del. 2003). In the interest of justice, rather than dismissing the matter, the

Court should transfer this action to the U.S. District Court for the Northern District of Illinois.

## IV.    CONCLUSION

Aladdin believes it has met its burden of establishing on this record that this Court has

personal jurisdiction over Feitian pursuant to Fed.R.Civ.P. 4(k)(2). Aladdin therefore

respectfully requests the entry of an Order denying the motion to dismiss with prejudice and a

direction that Feitian file an answer to the Complaint within twenty days of the Court's Order.

In the alternative, pursuant to 28 U.S.C. § 1631, in the interest of justice, this matter

should be transferred rather than dismissed because Aladdin has established on this record that it

could have initially filed suit against Feitian in the U.S. District Court for the Northern District of

Illinois. A balancing of the private interest and the public interest factors considered for 28

U.S.C. § 1404(a) transfer motions also tips in favor of transfer rather than dismissal.

|  |  |
|---|---|
|  | KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP |
| CO-COUNSEL: | |
| Michael K. Coran, Esquire<br>Mary Ellen O'Laughlin, Esquire<br>260 South Broad Street, 4th Floor<br>Philadelphia, PA 19102<br>Telephone (215) 568-6060 | By: *Patrick A. Costello*<br>David S. Eagle (Bar No. 3387)<br>Patrick A. Costello (Bar No. 4535)<br>919 Market Street, Suite 1000<br>Wilmington, DE 19801-3062<br>Telephone (302) 552-5508<br>Fax (302) 426-9193<br>*deagle@klehr.com*<br>*pcostello@klehr.com* |
| Dated: November 20, 2006 | *Attorneys for Plaintiff*<br>*Aladdin Knowledge Systems, Ltd* |

40