IN THE UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF DELAWARE**

Aladdin Knowledge Systems, Ltd.,          :
                      Plaintiff,          :
     v.          :          CIVIL ACTION NO. 05-149 (GMS)
                                :
Feitian Technologies Co., Ltd., et al.,          :
                                :
             Defendants.          :
_____:

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

NO. 05-149

ALADDIN KNOWLEDGE SYSTEMS, )          DEPOSITION UPON
LTD.,                       )
                            )          ORAL EXAMINATION
                            )
            Plaintiffs,)                    OF
                            )
      - vs -                )              WEI LI
                            )
FEITIAN TECHNOLOGIES CO.,   )
LTD.,                       )
                            )
                            )
            Defendants.)
- - - - - - - - - - - - - -

        TRANSCRIPT OF CONTINUATION OF TELEPHONIC
DEPOSITION, taken by and before ELISABETTA L. ANDREINI,
Professional Reporter and Notary Public, at the offices
of KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS,
Philadelphia, Pennsylvania, on Wednesday, October 25,
2006, commencing at 9:00 p.m.

              ERSA COURT REPORTERS
              30 South 17th Street
            United Plaza - Suite 1520
          Philadelphia, Pennsylvania  19103

ORIGINAL

WEI LI

2

A P P E A R A N C E S:

       KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS

       BY:  MARY ELLEN O'LAUGHLIN, ESQUIRE

       260 South Broad Street

       Philadelphia, PA 19103

       Attorney for the Plaintiff


       LOCKE, LIDDELL & SAPP, LLP

       BY:  MATTHEW G. REEVES, ESQUIRE

       3400 JP Morgan Chase Tower

       600 Travis

       Houston, TX 77002-3095

       Attorney for the Defendant

       Via Telephone


Jonathan Quach, Interpreter # 1

Barry Mak, Interpreter #2

Via Telephone


Interpreter # 3, ID # 258201

WEI LI

3

# I N D E X

WITNESS                                           PAGE

WEI LI


   By:  Ms. O'Laughlin                              6

- - -


# E X H I B I T S

PAGE

NUMBER                    DESCRIPTION          MARKED

(There were no exhibits marked at this time.)

```
 1              -- PROCEEDINGS --
 2         MS. O'LAUGHLIN:  This is a continuation
 3    of the jurisdictional discovery deposition of
 4    Feitian designee, Wei Li.  Now, on the first
 5    day of Mr. Li's deposition, which was on
 6    August 30, 2006, Mr. Reeves, Feitian objected
 7    to any questions during the deposition as to
 8    any of Feitian U.S. contacts other than with
 9    Delaware and California.  Since then
10    documents have been produced by Feitian U.S.
11    distributor RF Ideas, Inc., which does
12    business as Security Tokens, and those
13    documents have been provided to Feitian.
14    Will Feitian allow Aladdin to ask questions
15    concerning its contacts with states other
16    than Delaware and California including
17    Illinois at this deposition?
18         MR. REEVES:  No.
19         MS. O'LAUGHLIN:  Okay.  Aladdin isn't --
20         MR. REEVES:  The court order was that
21    Delaware and California, and so for the most
22    part, we're going to do that.
23         MS. O'LAUGHLIN:  Mr. Reeves, would you
24    repeat that?  There's a bad echo for some
```

WEI LI

5

1   reason.  I don't know.  It seems to be on

2   your end.  Can you hear the echo?

3        MR. REEVES:  I hear the echo, so I'll

4   try to go slowly.

5        MS. O'LAUGHLIN:  Please.

6        MR. REEVES:  We are going to maintain

7   our objections except to the extent that the

8   court has overruled them, which is in

9   California and Delaware.

10        MS. O'LAUGHLIN:  Okay.  Mr. Reeves, the

11   echo is pretty bad.  Do you think that you

12   could hang up and then rejoin the conference,

13   or is there something you can do on your end

14   to make the echo go away?

15        MR. REEVES:  All right.  Does this help?

16        MS. O'LAUGHLIN:  Yes, a little.

17        MR. REEVES:  I still hear a lot of echo

18   on my end.

19        MS. O'LAUGHLIN:  I do too.  I don't know

20   why that's happening.

21        MR. REEVES:  I will hang up and

22   immediately call back.

23        (Brief pause.)

24        MR. REEVES:  Hello?

1              MS. O'LAUGHLIN:  I still hear it, and I

2         just had the interpreter tell Mr. Li that you

3         had gotten off the phone and then rejoined us

4         because of the problem with the phone and

5         there wasn't a problem when I was just

6         talking to Mr. Li.  So it is on your end, but

7         we'll try to work through it.

8              MR. REEVES:  Okay.

9              MS. O'LAUGHLIN:  Okay.  Aladdin is not

10         waiving its position that it's entitled to

11         ask about all Feitian U.S. contacts, but I

12         understand your objection.

13   BY MS. O'LAUGHLIN:

14   Q.      Mr. Li, I want to remind you that you're

15   still under oath; that you have promised to tell the

16   truth in answering my questions.  Do you understand

17   that?

18   A.      I understand.

19   Q.      What did you do to prepare for today's

20   deposition?

21   A.      I understand the situation before.

22   Q.      Mr. Li, that does not answer my question.  My

23   question is, what did you do to prepare to answer my

24   questions today?

WEI LI

1               INTERPRETER # 1:  Can I ask him to speak

2        louder?

3               MS. O'LAUGHLIN:  Yes.

4               THE WITNESS:  I would like to have my

5        associate to review all related material.

6    BY MS. O'LAUGHLIN:

7    Q.        Did you, Mr. Li, review any material?

8    A.        I roughly review the information, but,

9    however, my English is not very good.

10   Q.        Does that mean that you did not understand

11   what you reviewed?

12   A.        Someone explain it to me.

13   Q.        Who explained it to you?

14   A.        Liu Hui.

15   Q.        Is that the sales manager who is -- you were

16   in charge of?

17   A.        I don't quite understand.

18   Q.        Okay.  The last time when I asked you

19   questions you told me that you are the vice manager in

20   charge of sales and that Liu Hui reports to you.  Is

21   Mr. Liu the same person -- let me ask again.

22          Okay.  The last time I asked you questions

23   you told me you are the vice manager in charge of sales

24   and that a man named Liu Hui or Hui Liu reports to you.

**WEI LI**

8

1    Is Mr. Liu the person who reviewed the materials with

2    you to prepare for today's deposition?

3                          INTERPRETER # 1:  Vice sales?

4                          MS. O'LAUGHLIN:  Vice manager in charge

5              of sales.

6                          INTERPRETER # 1:  Hello?

7                          Okay.

8    BY MS. O'LAUGHLIN:

9    Q.        Okay.  Do you remember what materials you

10   reviewed with Mr. Liu?

11                          INTERPRETER # 1:  I asked him to speak

12              louder.

13                          THE WITNESS:  I e-mailed to -- okay.  I

14              e-mail my document to -- okay.

15                          INTERPRETER # 1:  Can I ask him?

16                          MS. O'LAUGHLIN:  Yes.

17                          INTERPRETER # 1:  So it is not a e-mail.

18                          I saw the information before.

19   BY MS. O'LAUGHLIN:

20   Q.        Mr. Li, did you review any new material to

21   prepare for the deposition today that you had not

22   reviewed before the first day of the deposition?

23   A.        Okay.  The related material I already

24   reviewed and I basically understand.

**WEI LI**

9

1    Q.        Okay.  Mr. Li, I want you to remember to keep

2    your voice loud because you are in your office in

3    Beijing, I am in Philadelphia in my office with the

4    interpreter and the court reporter, and your attorney

5    is in his office in Texas.

6    A.        Right.

7    Q.        Okay.  Right now your voice is okay to us.

8    Okay.  Mr. Li, did you ask Mr. Liu to look to see if

9    there were any e-mails from anyone located in Delaware

10   to Feitian?

11   A.        I don't understand.

12                   MS. O'LAUGHLIN:  What did he say?

13                   INTERPRETER # 1:  Hello?

14                   THE WITNESS:  I don't understand your

15              Chinese.

16                   MS. O'LAUGHLIN:  He doesn't understand

17              your Chinese?

18                   INTERPRETER # 1:  So I translate the one

19              that -- the Chinese in Beijing also is

20              probably somewhat different in expression

21              than what I learn in Southeast Asia.

22                   MS. O'LAUGHLIN:  Okay.  Let us try to

23              ask him if he just -- ask him if he can

24              understand you at all because if not we can

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WEI LI

10

1       get another.

2              INTERPRETER # 1:  Okay.  There are two

3       reasons; my accent, my Chinese accent, and my

4       use of term.  I don't -- some terms in

5       Chinese I don't understand.

6              MS. O'LAUGHLIN:  Okay.  Matt?

7              MR. REEVES:  Yes.

8              MS. O'LAUGHLIN:  I'm going to call and

9       get a new interpreter, so I'm going to ask

10      you to -- both of you to hang up and call

11      back in five minutes, and I'll have someone

12      else on the line.  Okay?

13             MR. REEVES:  Five?

14             MS. O'LAUGHLIN:  Right.

15             MR. REEVES:  Okay.

16             MS. O'LAUGHLIN:  So could you -- but

17      before we get off, I'm going to ask the

18      interpreter to tell Mr. Li that and --

19             MR. REEVES:  I don't know if he'll

20      understand.

21             MS. O'LAUGHLIN:  And then to confirm,

22      ask him to confirm that he understands that

23      he is to call the same number in five

24      minutes.

WEI LI

11

1            MR. REEVES:  Okay.  Well, I think five

2     minutes is kind of short.  Can we make it

3     ten?

4            MS. O'LAUGHLIN:  Okay.  We can make it

5     ten.

6            MR. REEVES:  Ten minutes, that will be

7     my time 8:30, Texas time.

8            MS. O'LAUGHLIN:  That will be 8:30 Texas

9     time and 9:30 Beijing time and 9:30 Eastern

10    Standard time.  Okay.

11           MR. REEVES:  Ten minutes.

12           MS. O'LAUGHLIN:  Ten minutes.  So wait a

13    minute before you get off.  I want to have

14    the interpreter tell Mr. Li and get him to

15    confirm that he understands.

16           MR. REEVES:  All right.

17           INTERPRETER # 1:  Okay.

18           MS. O'LAUGHLIN:  Does he understand?

19           INTERPRETER # 1:  Uh-huh.

20           MS. O'LAUGHLIN:  Can you ask him if he

21    understands?

22           INTERPRETER # 1:  Okay.  Okay.  So it's

23    better to find someone that can speak the

24    Chinese without accent and knowledgeable in

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WEI LI

12

1        commercial terminology.

2               MR. REEVES:  Make sure he knows ten

3        minutes, ten minutes call back.

4               MS. O'LAUGHLIN:  Does he understand that

5        he is to call back in ten minutes?  Ask him

6        that.

7               THE WITNESS:  I understand.

8               MS. O'LAUGHLIN:  Okay.  So ten minutes,

9        Matt.

10              MR. REEVES:  Okay.

11              MS. O'LAUGHLIN:  Bye.

12              (At this time, a brief recess was

13       taken.)

14              MS. O'LAUGHLIN:  We have a new

15       interpreter.

16              INTERPRETER # 2:  Let me see if I can

17       communicate.

18              MS. O'LAUGHLIN:  Would you tell him what

19       I just said?  So you're going to just

20       translate what I just said.  Just tell him,

21       Mr. Li, we have a new interpreter.

22              Can you understand him?

23              INTERPRETER # 2:  Hello?

24              MS. O'LAUGHLIN:  Does he understand?

WEI LI

13

1        INTERPRETER # 2:  Hello?

2        I'm sorry.  We cannot communicate that

3   good.  We are -- he don't understand me.

4   It's different accents.  I'm not

5   communicating.  Sorry.

6        MS. O'LAUGHLIN:  So he doesn't

7   understand you either?

8        INTERPRETER # 2:  No.  I'm sorry.

9        MS. O'LAUGHLIN:  What is that?  What's

10   he saying?  He doesn't understand you?

11        INTERPRETER # 2:  Yeah, that's correct.

12   Yeah.

13        MS. O'LAUGHLIN:  Okay.

14        INTERPRETER # 2:  Sorry for the

15   convenience.  I thought you need to

16   understand completely.

17        MS. O'LAUGHLIN:  I'll try to call back

18   the company and ask the --

19        INTERPRETER # 2:  Sorry for convenience.

20   Bye.

21        MS. O'LAUGHLIN:  Matt, could you just

22   stay on the line?

23        MR. REEVES:  Sure.

24        MS. O'LAUGHLIN:  I'm going to try to

1           patch another one in just a second.

2                (Brief pause.)

3                MS. O'LAUGHLIN:  Matt, are you back on?

4                Would you just tell Mr. Li that we're

5       waiting for Mr. Reeves?

6                INTERPRETER # 3:  Okay.  Mr. Li would

7       like to know why the former interview did not

8       continue.

9                MR. REEVES:  Okay.  I'm here.

10               MS. O'LAUGHLIN:  Great.  I just asked

11      the new interpreter -- we now have a third

12      interpreter on the line, and I just asked her

13      to tell Mr. Li that we were waiting for you.

14               MR. REEVES:  Okay.  Mr. Li is on the

15      line then?

16               MS. O'LAUGHLIN:  Yes, because he --

17               MR. REEVES:  All right.

18               MS. O'LAUGHLIN:  He came on before you

19      came on, but Mr. Li just asked the new

20      interpreter a question.

21               Would you repeat what you said?

22               THE WITNESS:  Okay.  I would like to

23      know why the former interpreter did not

24      continue to interpret.

WEI LI

15

1              MS. O'LAUGHLIN:  Because, Mr. Li, you

2          said that you did not understand that

3          interpreter.

4              THE WITNESS:  The first interpreter I

5          did say that I did not understand him or her;

6          however, the second one I did not say that I

7          did not understand.

8              MS. O'LAUGHLIN:  All right.  Mr. Li,

9          that was not my understanding from what the

10         second interpreter told us, but I thank you

11         for your patience.  And now we have a third

12         interpreter and are you having -- do you

13         understand when she interprets?

14             THE WITNESS:  Okay.

15             MS. O'LAUGHLIN:  Yes, you understand?

16             THE WITNESS:  Yes, I understand it now.

17    BY MS. O'LAUGHLIN:

18    Q.        Great.  Mr. Li, do you also understand that

19    you are still under oath; that is that you have

20    promised to tell -- you have sworn and promised to tell

21    the truth in answering my questions today?

22    A.        Yes.

23    Q.        Mr. Li, did you review any materials to

24    prepare for today's deposition?

WEI LI

16

1    A.        Yes, I did study the materials which I had

2    before.

3    Q.        What materials did you study?

4    A.        The related documents.

5    Q.        Could you identify what you mean by the

6    related documents?

7              INTERPRETER # 3:  Excuse me.  This is

8              the interpreter.  I have to ask the witness

9              to speak louder because I cannot hear him

10             very well.

11             THE WITNESS:  The related documents

12             include the faxed materials between the

13             customers or among the customers.

14             MS. O'LAUGHLIN:  The faxed materials?

15             INTERPRETER # 3:  Excuse me.  This is

16             interpreter.  I have to ask him --

17             THE WITNESS:  Yes, the documents are

18             documents which were faxed, faxed document,

19             F-A-X, document or copied materials.

20   BY MS. O'LAUGHLIN:

21   Q.        Okay.

22   A.        Or printed documents.

23   Q.        Interpreter, I don't understand the answer

24   then.

WEI LI

17

1                    INTERPRETER # 3:  Printed documents and

2              the faxed documents.

3                    THE WITNESS:  We used the printed

4              machine to print the documents.

5    BY MS. O'LAUGHLIN:

6    Q.        What documents?

7    A.        The records of the customer and the records

8    of the market.

9    Q.        And the records of the what?

10                    INTERPRETER # 3:  Of the market,

11              M-A-R-K-E-T.

12    BY MS. O'LAUGHLIN:

13    Q.        Did you find in those records any customers

14    located in Delaware?

15    A.        No.

16    Q.        Did you find in those records any customers

17    located in California?

18    A.        Yes.

19    Q.        Okay.  What customers are located in

20    California?

21    A.        I have given the information to my lawyer.

22    Q.        Okay.  Did you give your lawyer all the

23    information that you found about customers located in

24    California?

WEI LI

18

```
 1   A.          Yes.

 2   Q.          Do you have those records that you gave your

 3   attorney in front of you?

 4   A.          No.

 5   Q.          Can you get them?

 6   A.          Yes.

 7   Q.          Okay.  Could you get them and have them in

 8   front of you, because I'm going to ask you questions

 9   about them?

10   A.          Yes.

11   Q.          Okay.  How long will that take?

12   A.          About five minutes.

13   Q.          Okay.  We will all hold.

14   A.          Okay.

15                  (Brief pause.)

16   BY MS. O'LAUGHLIN:

17   Q.          Mr. Li?

18   A.          Hi.

19   Q.          Okay.  If you could look -- you have the

20   documents in front of you now?

21   A.          Yes.

22   Q.          Okay.  If you would, look at the Performa

23   invoice that's dated April 13, 2003, showing the

24   exporters Feitian Technology Company, Limited and sold
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WEI LI

19

1    to Susteen, Inc.  Do you see that?

2                    INTERPRETER # 3:  Would you please

3            repeat the corporations' names?  The date was

4            April 13, 2003 of which?

5                    MS. O'LAUGHLIN:  2005.  2005.

6                    INTERPRETER # 3:  2005.  Of which

7            corporation, please?

8                    MS. O'LAUGHLIN:  Susteen, S-U-S-T-E-E-N,

9            Inc.

10                    INTERPRETER # 3:  S-U-S-T-E-E-N.

11           Susteen.

12                    MS. O'LAUGHLIN:  Susteen, Inc., just

13           incorporated.

14                    INTERPRETER # 3:  Okay.

15                    MS. O'LAUGHLIN:  Interpreter, let me

16           just ask it again and maybe it will be

17           easier.

18                    INTERPRETER # 3:  Okay.

19   BY MS. O'LAUGHLIN:

20   Q.        Do you have in front of you the Performa

21   invoice dated April 13, 2005 showing a sale to Susteen?

22   A.        Yes.

23   Q.        Okay.  And for the record, this document was

24   Bates stamped FT 00052.  Do you know if --

WEI LI

20

1    A.        What is that, 00052?

2    Q.        I was just -- you didn't need to interpret

3    that, but let me --

4                    INTERPRETER # 3:  I didn't know that.

5    BY MS. O'LAUGHLIN:

6    Q.        But now that he asked, let me explain that

7    you can tell Mr. Li that when Feitian, when his

8    attorney produced this document, all these documents,

9    they put numbers at the bottom to identify them.

10                   INTERPRETER # 3:  I see.

11                   MS. O'LAUGHLIN:  So I was just

12              identifying the document for the record.

13                   INTERPRETER # 3:  Okay.

14                   MS. O'LAUGHLIN:  In the lawsuit.

15                   INTERPRETER # 3:  Okay.

16                   MS. O'LAUGHLIN:  So you can explain that

17              to him.

18                   INTERPRETER # 3:  Okay.  I understand.

19   BY MS. O'LAUGHLIN:

20   Q.        Okay.  Mr. Li, where did you find this

21   document?

22   A.        At home.

23   Q.        Okay.  At your home?

24   A.        No, in my office, in office.

WEI LI

21

1   Q.          Okay.  Do you know, were there any other

2   documents concerning any sales to Susteen other than

3   this document?

4                    INTERPRETER # 3:  I have to ask him to

5               speak louder.

6                    THE WITNESS:  No, I did not find

7               anymore.

8   BY MS. O'LAUGHLIN:

9   Q.          Okay.  Did you look for any other documents

10  about Susteen?

11  A.          I did look for it; however, I did not find

12  any.

13  Q.          Did you look to see if -- did you look to see

14  if there were any e-mails from or to Susteen?

15  A.          I also looked for it, but I did not find any.

16  Q.          Okay.  Where did you look?

17  A.          In the computer of Liu Hui.

18  Q.          Of who?

19  A.          Of Liu Hui.

20  Q.          Okay.  That is your sales manager?

21  A.          Yes.

22  Q.          Okay.  Did you look in anyone else's?  Did

23  you look anywhere else for any documents concerning

24  sales to Delaware or California other than in Mr. Liu's

1    computer?

2                    INTERPRETER # 3:  I have to ask him to

3            repeat.  The voice is still not loud enough.

4                    THE WITNESS:  Yes, I look for it in all

5            the files, but I did not find any.

6    BY MS. O'LAUGHLIN:

7    Q.        Okay.  When you say you looked in all the

8    files, please describe what files you looked in?

9    A.        Meaning the folders to put the documents in.

10   Q.        What folders?

11   A.        It is the folders which related to customers'

12   information.

13   Q.        That customer information, how many years

14   does it cover?

15   A.        Only important information which I think I

16   need to keep.  All the information is in the folder.

17   Q.        Did you look through all of Feitian's sales

18   records from October 1999 until the present for the

19   information about communications or sales to Delaware

20   or -- from Delaware or California?

21                   INTERPRETER # 3:  Can you mention the

22           states again and the corporation name?

23   BY MS. O'LAUGHLIN:

24   Q.        Yes.  The last time we spoke you said that

WEI LI

23

1    Feitian only kept records for three months.  Did you

2    find records -- was that a mistake?  Are you saying now

3    that you looked that Feitian has records going back to

4    October of 1999?

5    A.        I think you misunderstood what I meant.  Was

6    the information was kept by the person who was in

7    charge and after three month the information was moved

8    to a folder which other people can also have access to.

9    Q.        So you are testifying today that you have

10   looked through all of Feitian's business records from

11   October 1999 to the present concerning sales or

12   communications from or to Feitian and Delaware and

13   California and you have produced everything that you

14   found to your attorney; is that correct?

15   A.        Yes.

16   Q.        Okay.  If you would look at -- well, looking

17   back at the Performa invoice to Susteen, is this a

18   document that was created by Feitian?

19   A.        Yes.

20   Q.        Okay.  Does it show that there was -- does

21   this indicate that there was a sale by Feitian to

22   Susteen?

23   A.        Yes.

24   Q.        Okay.  And what was sold was 500 pieces of

WEI LI

24

1   Rocky 100 for a total price of 7,500 Unites States

2   dollars?

3                       INTERPRETER # 3:  Excuse me.  7,500 how

4             much?

5                   MS. O'LAUGHLIN:  United States dollar.

6                   INTERPRETER # 3:  U.S. dollars?

7                   MS. O'LAUGHLIN:  Yes.

8                   THE WITNESS:  Yes.

9   BY MS. O'LAUGHLIN:

10  Q.        Okay.  And Feitian shipped the product to

11  Susteen in Irvine, California by DHL International?

12  A.        That's right.

13  Q.        Okay.  And that freight charge was 80 U.S.

14  dollars; is that correct?

15  A.        Yes.

16  Q.        Did Feitian receive $7,580 for that sale?

17  A.        Excuse me.  I didn't hear.

18            Yes.

19  Q.        And how was that payment made?  Do you know?

20  A.        It was by wire.

21  Q.        And is the wire transfer information the

22  information that's set forth on the bottom of the

23  Performa invoice?

24                  INTERPRETER # 3:  Excuse me.  Would you

## WEI LI

25

```
 1              please repeat the question?

 2                   MS. O'LAUGHLIN:  Yes.

 3   BY MS. O'LAUGHLIN:

 4   Q.        Is the wire transfer information for Feitian

 5   located on this Performa invoice at the bottom?

 6   A.        Yes.

 7   Q.        Okay.  Does Feitian have any records of

 8   monies that it receives from sales to California?

 9   A.        No, I did not find it.  I just made a check,

10   you know, the check does show the money was received.

11   Q.        My question is, Mr. Li, does Feitian have

12   records that show specifically revenue that they,

13   Feitian, received from sales in California?

14   A.        Are you asking specifically for the sales to

15   California?

16   Q.        Yes.

17   A.        No.

18   Q.        Has Feitian ever done any analysis to see how

19   much revenue Feitian has received because of sales to

20   California?

21   A.        No.

22   Q.        Okay.  Does Feitian keep track of revenues

23   generated because of sales to the United States?

24   A.        No.
```

**WEI LI**

26

1    Q.        If you would look at the purchase order, to

2    purchase order number 12944 to a company called ICRCO.

3                    INTERPRETER # 3:  Okay.  ICRCO?

4                    MS. O'LAUGHLIN:  Yes.

5                    INTERPRETER # 3:  And the number is

6            12944.

7                    MS. O'LAUGHLIN:  Yes, the purchase --

8            the document is entitled purchase order.

9            It's number 129444, okay, and it's Bates

10           stamped FT 00055.

11                   INTERPRETER # 3:  Okay.  Your question

12           is?

13   BY MS. O'LAUGHLIN:

14   Q.        Ask him to look for the purchase order number

15   12944 to ICRCO.

16   A.        Yes.

17   Q.        You have that in front of you?

18   A.        Yes.

19   Q.        Okay.  And is this a purchase order that was

20   created by Feitian?

21   A.        The specific order number 12944 was not

22   created by Feitian.

23   Q.        Okay.  Do you know who created it?

24   A.        It's created by ICR Corporation.

WEI LI

27

1    Q.        Okay.  Is ICRCO a customer of Feitian?

2    A.        Yes.

3    Q.        Okay.  Do you know how long it's been a

4    customer of Feitian?

5    A.        I think it's begin earlier this year,

6    beginning of this year.

7    Q.        Okay.  Well, the top of this purchase order

8    the date is 1/24/2006, so January 24, 2006, do you know

9    if this was the first -- do you know if there were any

10   earlier sales to ICRCO?

11   A.        I did not find it.

12   Q.        Okay.  Did you find any e-mails to or from

13   ICRCO?

14   A.        No.

15   Q.        Do you know how ICRCO became a customer of

16   Feitian?

17   A.        It was transferred from RF Ideas.

18   Q.        RF Ideas?

19             INTERPRETER # 3:  Excuse me.

20             MS. O'LAUGHLIN:  RF Ideas.

21   BY MS. O'LAUGHLIN:

22   Q.        And RF Ideas was Feitian's distributor in the

23   United States?

24             INTERPRETER # 3:  Excuse.  Your question

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

1           is RF Ideas is?

2  BY MS. O'LAUGHLIN:

3  Q.        Was RF Ideas Feitian's distributor for

4  Feitian's products in the United States?

5  A.        It originally was.

6  Q.        Okay.  And at this time, at the time of this

7  purchase order, it was no longer your distributor; is

8  that correct?

9  A.        That's right.

10  Q.        Do you know when RF Ideas was your

11  distributor whether ICRCO was a customer of Feitian?

12            INTERPRETER # 3:  Would you please

13            repeat the question?

14            MR. REEVES:  Would you wait just one

15            minute while I get this vacuum cleaner turned

16            off.

17            MS. O'LAUGHLIN:  Sure.

18            INTERPRETER # 3:  Mr. Li wants to know

19            what his lawyer said; however -- this is the

20            interpreter -- I did not hear very well what

21            the lawyer said.

22            MR. REEVES:  Doesn't matter.  I'm back.

23  BY MS. O'LAUGHLIN:

24  Q.        I believe my last question was, how do you

WEI LI

29

1    know whether ICRCO was a customer that came from RF

2    Ideas?

3    A.        I was told by Liu Hui.  Liu Hui told me.

4    Q.        Did Mr. Liu tell you whether there had been

5    other sales, prior sales, to ICRCO by Feitian?

6    A.        All the information he found was this much.

7    Q.        Did you ask Mr. Liu how he knew that ICRCO

8    came from -- was a customer that came to Feitian

9    through RF Ideas?

10   A.        Yes, I ask.

11   Q.        And what did he say?

12   A.        He said yes.

13   Q.        Does Feitian have records of all of the

14   customers that came to RF -- came to Feitian through RF

15   Ideas?

16   A.        Yes.

17   Q.        Did you look through those records?

18   A.        Yes.

19   Q.        And did you look through those records for

20   any sales of Feitian products made by RF Ideas to

21   California?

22   A.        Yes, I looked.

23   Q.        What kind of records does Feitian keep about

24   sales made through RF Ideas?

WEI LI

30

1    A.        Invoice.

2    Q.        Any others, kinds of records?

3    A.        There are e-mails.

4    Q.        Okay.  Did you produce all of the records

5    that you have concerning sales by RF Ideas in

6    California or e-mails from RF Ideas to California to

7    your attorney?

8               INTERPRETER # 3:  Would you please

9               repeat this question, please?

10              MS. O'LAUGHLIN:  Sure.

11              MR. REEVES:  I would object to the

12              extent that that seeks information beyond

13              Feitian contacts with Delaware or California

14              and begin to inquire into RF Ideas with

15              Delaware or California.

16              INTERPRETER # 3:  I didn't hear very

17              well what the attorney said.

18              MS. O'LAUGHLIN:  He was just making an

19              objection.  Matt, do you want that

20              interpreted?

21              MR. REEVES:  I would like that

22              interpreted.  I'm objecting to the question

23              to the extent that it goes beyond Feitian's

24              contacts with California or Delaware and

1          seeks information pertaining to RF Ideas'

2          contacts with California or Delaware or

3          Feitian's contacts with RF Ideas, which did

4          not occur in either Delaware or California.

5                    THE WITNESS:  Okay.  I understand.

6     BY MS. O'LAUGHLIN:

7     Q.        Well, Mr. Li, could you answer the question,

8     please?

9     A.        I don't want to answer.

10                    MS. O'LAUGHLIN:  Mr. Reeves, are you

11          taking the position that if RF Ideas had a

12          communication with a customer in California

13          on behalf of Feitian trying to sell Feitian

14          products or offering Feitian products for

15          sale to the customer in California that that

16          communication between RF Ideas and that

17          California customer which was then copied to

18          Feitian is beyond the scope of the

19          jurisdictional discovery ordered by the

20          Court?

21                    MR. REEVES:  Yes, I am saying that.

22          Feitian had contacts with its distributor RF

23          Ideas and if RF Ideas in turn sold those to

24          other places in the country, then that is not

1          a contact between Feitian and any of those

2          other places.  In other words, RF Ideas

3          cannot make vicariously a contact between

4          Feitian and somebody that's not communicated

5          with --

6               MS. O'LAUGHLIN:  Someone who did not

7          communicate with Feitian.

8               MR. REEVES:  That Feitian did not

9          communicate with.  In other words, there's no

10         vicarious personal jurisdiction.

11              MS. O'LAUGHLIN:  So if Feitian -- if RF

12         Ideas -- so RF Ideas was Feitian's U.S.

13         distributor and RF Ideas on behalf of Feitian

14         makes a sale to a customer in California,

15         your contention is that that does not have

16         anything to do with whether or not the

17         Court -- a Court in California would have

18         jurisdiction over Feitian?

19              MR. REEVES:  Well, first off, I disagree

20         with the premise of your question that RF

21         Ideas was acting on behalf of Feitian.  RF

22         Ideas was not necessarily an agent for

23         Feitian.  Feitian simply sold the products to

24         RF Ideas and then RF Ideas resold those

WEI LI

33

1          products.  That's not acting on behalf of

2          Feitian.  Feitian was not actively trying to

3          do business in those other jurisdictions.

4          They were simply selling it.  But I disagree

5          with the premises of your questions to the

6          extent you're saying that Feitian makes a

7          sale to RF Ideas in Illinois and RF Ideas did

8          make that sale to, let's say, Texas.

9              MS. O'LAUGHLIN:  Well, let's say

10         California.

11             MR. REEVES:  Then it is subject to

12         personal jurisdiction in Texas.  My answer is

13         no.

14   BY MS. O'LAUGHLIN:

15   Q.      Okay.  Mr. Li, RF Ideas was the distributor

16   for Feitian in the United States, correct?

17   A.      It originally was.

18   Q.      Do you know what or from -- for what period

19   of time it was the distributor?

20   A.      From 2003 to 2005.

21   Q.      Okay.  And during that period of time RF

22   Ideas sales territory was the whole United States; is

23   that correct?

24             MR. REEVES:  I'm going to object to this

1          line of questioning that involves contacts

2          between Feitian and RF Ideas.  You already

3          know that Feitian had RF Ideas distributor.

4          There's no secret about that, but the

5          communication between contacts between

6          Feitian and RF Ideas which occurred in

7          Illinois is beyond the scope of discovery

8          permitted by the Court.

9              Now, if you want to talk about contacts

10         between Feitian and somebody in California,

11         that's permissible.  You can ask him all the

12         questions you want.  If you want to ask about

13         contacts with Feitian and anybody in

14         Delaware, that's fine too.  But if you want

15         to start going into detail about Feitian's

16         relationship with RF Ideas in context that

17         may have occurred in Illinois, then that's

18         beyond the scope of the discovery order

19         permitted by the Court.

20             MS. O'LAUGHLIN:  So you're not going to

21         let him answer questions about that.

22             MR. REEVES:  I'm not going to instruct

23         him not to.  I'm simply saying that I'm

24         objecting.  It's beyond the scope and they

WEI LI

35

1           can answer your questions if they choose to.

2    BY MS. O'LAUGHLIN:

3    Q.       Mr. Li, when RF Ideas was Feitian's

4    distributor, it could make sales of Feitian products in

5    California; is that correct?

6                MR. REEVES:  And I repeat my same

7           objection.

8                THE WITNESS:  Please do not ask me too

9           many questions about the relationship between

10          Feitian and RF Ideas.  That's beyond the

11          scope.

12   BY MS. O'LAUGHLIN:

13   Q.       Mr. Li, that's an interesting answer since

14   the interpreter did not translate Mr. Reeves's

15   objection.  Will you answer my question as to whether

16   or not when RF Ideas was Feitian's distributor in the

17   United States it could make sales of Feitian products

18   to California?

19   A.       Yes.

20   Q.       And during the period of time that RF Ideas

21   was Feitian's distributor in the United States, could

22   Feitian -- could RF Ideas make sales of Feitian

23   products in Delaware?

24   A.       Yes.

WEI LI

36

1   Q.        During the period of time that RF Ideas was

2   the distributor for Feitian, did Feitian pass any leads

3   to RF Ideas concerning possible customers in

4   California?

5   A.        No, we do not.  I did not find any records

6   relating to this.

7   Q.        Well, you testified earlier that Mr. Liu told

8   you that ICRCO came to Feitian through RF Ideas.  Do

9   you know how RF Ideas -- was that a lead that was

10  passed to RF Ideas?

11                  INTERPRETER # 3:  I didn't understand

12        the second part you said.

13  BY MS. O'LAUGHLIN:

14  Q.        Okay.  Let me ask this way.  Did Mr. Liu tell

15  you where he got the information from that ICRCO came

16  to Feitian from RF Ideas?

17  A.        ICR Company told Mr. Liu about this.

18  Q.        When did they tell Mr. Liu about this?

19  A.        I did not hear very well.

20            I'm not certain the exact time, the exact

21  date.

22  Q.        If you would look at the invoice that's dated

23  January 26, 2006 showing a sale to ICRCO -- do you have

24  that in front of you?

WEI LI

37

1    A.          Yes.

2    Q.          Okay.  And for the record, that's Bates

3    stamped FT 00056.  Mr. Li, is this the invoice that was

4    generated by Feitian concerning the purchase order

5    number 12944?

6    A.          You are talking about the invoice now, not

7    the purchase order, right?

8    Q.          Yes.

9    A.          Yes, the invoice was created by Feitian.

10   Q.          If you would look at the -- there is another

11   purchase order and another invoice to ICRCO.  The

12   purchase number is 13187, and the invoice has that same

13   PO number on it.  Do you see those documents?  They

14   were Bates stamped FT 00058 and 59.

15                    INTERPRETER # 3:  Okay.  That date is

16              December 27th?

17                    MS. O'LAUGHLIN:  No.

18                    INTERPRETER # 3:  I'm sorry.  It's

19              121 --

20                    MS. O'LAUGHLIN:  13187, purchase order

21              number.

22   BY MS. O'LAUGHLIN:

23   Q.          Do you see in front of you purchase order

24   13187 dated May 2, 2006, which has been Bates stamped

**WEI LI**

1    by your counsel as FT 00058?

2    A.        Yes.

3    Q.        Okay.  And there is another document, an

4    invoice, that's dated June 8, 2006, and the invoice has

5    a PO number 13187.  It's been Bates stamped FT 00058.

6    Do you have that in front of you?

7    A.        You said February 8th?

8    Q.        June 8th.

9    A.        June 8th, yes.

10   Q.        Okay.  So that invoice is for sale to ICRCO

11   relating to ICRCO purchase order number 13187; is that

12   correct?

13   A.        Yes.

14   Q.        Okay.  Then there's another invoice that's

15   dated November -- well, strike that.

16             Are those the only two invoices and purchase

17   orders that you found related to ICRCO?

18   A.        Yes.

19   Q.        Okay.  When RF Ideas was your distributor, if

20   RF Ideas made a sale of Feitian products to California,

21   would RF Ideas tell Feitian that it had made that sale?

22   A.        No.

23   Q.        Okay.  How would RF Ideas make -- would RF

24   Ideas send any purchase orders to Feitian and ask