WEI LI

1  Feitian to make direct shipments to the customer in

2  California?

3  A.         I did not find the documents related to this.

4  Q.         Do you know if that's what happened during

5  the relationship with RF Ideas?

6  A.         I do not want to answer this question which

7  is an assumption.

8  Q.         Well, my question is, do you know?  If you

9  know, you can say yes or no.

10  A.         Would you please repeat your question?

11  Q.         Do you know whether or not during the time RF

12  Ideas acted as a distributor for Feitian if it ever

13  requested that Feitian ship product directly to a

14  customer in California?

15  A.         I did not find the documents related to this.

16  Q.         Let's go back to the invoices that you -- the

17  other invoice that you sent.  It's dated November 16,

18  2005.  Well, before we get off ICRCO, has Feitian made

19  any other sales to ICRCO other than these, the purchase

20  order and -- the two purchase orders and invoices that

21  you provided?

22                  INTERPRETER # 3:  Are you away from the

23              telephone now?

24                  MS. O'LAUGHLIN:  Sorry.  Let me repeat.

WEI LI

1    BY MS. O'LAUGHLIN:

2    Q.        Has Feitian done any other business with

3    ICRCO other than the two purchase orders and invoices

4    that you have provided?

5    A.        I did not find the record.

6    Q.        Okay.  You also provided an invoice that's

7    dated November 16, 2005, concerning company Nuveon

8    located in Sunnyvale, California.  Do you have that

9    invoice in front of you?

10                    INTERPRETER # 3:  What is the company

11              name?

12                    MS. O'LAUGHLIN:  N-U-V-E-O-N, Nuveon.

13                    INTERPRETER # 3:  N-U-V-E-O-N.  Okay.

14                    THE WITNESS:  Yes.

15   BY MS. O'LAUGHLIN:

16   Q.        Okay.  And for the record, that's Bates

17   stamped FT 00059.  That invoice was created by Feitian;

18   is that correct?

19   A.        Yes.

20   Q.        And do you know how Nuveon became a customer

21   of Feitian?

22   A.        Nuveon contacted us.

23   Q.        Do you know how Nuveon found out about

24   Feitian?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WEI LI

1  A.        I do not know.

2  Q.        Did you ask?

3  A.        Yes.

4  Q.        Okay.  Who told you that Nuveon contacted

5  Feitian?

6  A.        Liu Hui.  It's Liu Hui.

7  Q.        Okay.  When did Mr. Liu excuse me -- did

8  Nuveon contact Mr. Liu, or did he just tell you that

9  they, that Nuveon contacted Feitian -- let me ask it a

10  better way.  I'm sorry.

11         Who did Nuveon contact at Feitian?

12  A.        I do not have the information to answer your

13  question.

14  Q.        Okay.  The invoice refers to a PO number 001.

15  Did you look -- do you have that PO, purchase order?

16  A.        It's the purchase order from Nuveon.

17  Q.        Yes.  Does Feitian have that?

18  A.        I have PO 001.

19  Q.        Okay.  You do have it because -- did you send

20  that to your attorney?

21  A.        This is -- do you ask me whether I send the

22  invoice to my lawyer?

23  Q.        No.  I'm asking whether you sent the purchase

24  order.

WEI LI

42

1   A.        No, because my company has invoice on hand.

2   Q.        The other purchase order -- there's another

3   purchase order that you sent for Polywell Computers.

4   It's purchase order number 48423 Bates stamped number

5   FT 00060.  Do you have that purchase order in front of

6   you, Mr. Li?

7                    INTERPRETER # 3:  Is the number is 4843?

8                    MS. O'LAUGHLIN:  48423.

9                    INTERPRETER # 3:  48423.  And it's from

10           Poly?

11               MS. O'LAUGHLIN:  Polywell,

12           P-O-L-Y-W-E-L-L, Computers, Inc.

13               INTERPRETER # 3:  P-O-L-Y-W-E-L-L,

14           Computer, Inc.

15               MS. O'LAUGHLIN:  Right.  South San

16           Francisco, California.

17               INTERPRETER # 3:  South San Francisco.

18               THE WITNESS:  Yes.

19  BY MS. O'LAUGHLIN:

20  Q.        Okay.  Do you know how Polywell came to be a

21  customer of Feitian?

22  A.        They contacted us.

23  Q.        Do you know how they found out about Feitian?

24  A.        I do not have that information.

WEI LI

43

1  Q.          Who told you they contacted Feitian?

2  A.          Liu Hui.

3  Q.          And Feitian generated two invoices for sales

4  to Polywell·Computers; is that correct; invoice dated

5  January 26, 2006 Bates stamped FT 00061 and the invoice

6  dated February 22, 2006 Bates stamped FT 00062?

7  A.          Yes.

8  Q.          Okay.  Is Polywell Computers still a customer

9  of Feitian?

10             INTERPRETER # 3:  Can you ask him to --

11             I cannot hear him very well.

12  BY MS. O'LAUGHLIN:

13  Q.          From what I have, after the two invoices

14  Polywell did not buy anything from Feitian anymore.

15  What about -- well, strike that.

16             If you could look at an e-mail to Larry Doyle

17  and from Larry Doyle that was produced.  Do you have

18  that in front of you?

19             INTERPRETER # 3:  How do you spell that?

20             MS. O'LAUGHLIN:  D-O-Y-L-E.

21             THE WITNESS:  Yes.

22  BY MS. O'LAUGHLIN:

23  Q.          Okay.  And that was Bates stamped number FT

24  000363, and Mr. Doyle is located in San Francisco,

WEI LI

44

1   California.  Do you know how Mr. Doyle came to find

2   Feitian?

3   A.        Mr. Doyle contacted us.

4   Q.        Who's Michael Liu?

5   A.        That's the English name of Liu Hui.

6   Q.        Okay.  Did Feitian sell any products to

7   Mr. Doyle or his company, Cyberain Design, Inc.?

8              INTERPRETER # 3:  What's the company

9              name?

10             MS. O'LAUGHLIN:  Cyberain,

11             C-Y-B-E-R-A-I-N, Design.

12             THE WITNESS:  No.

13   BY MS. O'LAUGHLIN:

14   Q.        Okay.  So Liu Hui speaks English?

15             INTERPRETER # 3:  That's Liu Hui?

16   BY MS. O'LAUGHLIN:

17   Q.        Sorry.  Hui Liu, Michael Liu speaks English?

18   A.        Yes.

19   Q.        And he reads English and writes English?

20   A.        Yes.

21   Q.        And Mr. Liu is the one who told you that you

22   would be the designee for Feitian for this deposition?

23             INTERPRETER # 3:  Would you please

24             repeat your question?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WEI LI

45

1   BY MS. O'LAUGHLIN:

2   Q.        Mr. Liu is the one who told you, Mr. Li, that

3   you would be the Feitian designated witness for this

4   deposition, right?

5              MR. REEVES:  I object to that question

6              as being vague.

7              MS. O'LAUGHLIN:  Okay.  I don't see how

8              it's vague, Matt, but let's go back to the --

9              MR. REEVES:  My question is, are you

10             saying that Mr. Liu designated Mr. Li?

11             MS. O'LAUGHLIN:  What he --

12             MR. REEVES:  Is that what you remember

13             or --

14             MS. O'LAUGHLIN:  Yes.

15             MR. REEVES:  Or are you just saying that

16             Mr. Liu told him that this deposition would

17             be occurring because Mr. Li does not speak

18             English?  What's your question?

19  BY MS. O'LAUGHLIN:

20  Q.        Okay.  My question is -- well, if you look

21  back at his prior testimony, Mr. Li's prior testimony,

22  when I asked him how he came to be the designated

23  witness for Feitian, he told me that Mr. Liu told him

24  that he was the designated witness.

WEI LI

46

1          MR. REEVES:  Okay.  Then I -- maybe you

2          can rephrase to something like did Mr. Liu

3          designate you or something like that?  I

4          don't know.  I just think it's going to be

5          confusing to him.  Your question goes to who

6          had the authority to tell who, what, and it

7          can also be interpreted if you don't speak

8          Chinese I'm letting somebody who speaks

9          English kind of interpret for you, but go

10         ahead and ask your question.

11   BY MS. O'LAUGHLIN:

12   Q.     Mr. Li, did Mr. Hui tell you that you were

13   going to be the designated witness for Feitian at this

14   deposition?

15   A.     It's determined that by the corporation.

16   Q.     Do you know who -- at your last deposition,

17   Mr. Li --

18          INTERPRETER # 3:  Excuse me.  Mr. Li

19          said something which I did not hear very

20          well.

21          Mr. Li asks when we can have a break for

22          ten minutes.

23          MS. O'LAUGHLIN:  Does he need to take a

24          break now?  Is he asking for a break now?

WEI LI

47

1      THE WITNESS:  Yes, I would like to go to

2   the restroom.

3      MS. O'LAUGHLIN:  Okay.  Just don't

4   disconnect anyone.  We'll just come back

5   in -- do you need ten minutes or --

6      THE WITNESS:  Yes, ten minutes.

7      MS. O'LAUGHLIN:  Okay.

8      INTERPRETER # 3:  Yeah.  All right.  I

9   will not hang up.  I will not.  I will be

10   back too.

11      MS. O'LAUGHLIN:  Okay.  Tell Mr. Li not

12   to hang up either.

13      THE WITNESS:  If I hang up, can you call

14   me ten minutes later?

15      MS. O'LAUGHLIN:  No.  Just don't hang

16   up.  Just stay on the line.  Just keep the

17   line open.

18      THE WITNESS:  Okay.  Okay.

19      (At this time, a brief recess was

20   taken.)

21      INTERPRETER # 3:  This is the

22   interpreter.  I'm back.

23      MS. O'LAUGHLIN:  Mr. Li?  Mr. Li?

24      INTERPRETER # 3:  Yes.  Okay.  Mr. Li is

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WEI LI

48

1            back.

2      BY MS. O'LAUGHLIN:

3      Q.        Mr. Li, you testified during the first day of

4      your deposition that Liu Hui was the one who told you

5      that you were going to testify as the designated

6      witness for Feitian?

7                  MR. REEVES:  Wait a minute.  Sorry.  I

8                  didn't get the question.  Can you repeat it?

9                  MS. O'LAUGHLIN:  Yes.

10     BY MS. O'LAUGHLIN:

11     Q.        Mr. Li, during the first day of your

12     deposition you testified that Mr. Liu was the one who

13     told you that you would be the designated witness for

14     Feitian at this deposition.  Do you know who made the

15     decision that you would be the one to testify as the

16     designated witness?

17     A.        The corporation.

18     Q.        Who at the corporation?

19     A.        It was discussed at the -- determined by the

20     board of directors.

21     Q.        Who is on the board of directors?

22     A.        The directors of the corporation.

23     Q.        What are the names of the directors of the

24     corporation?

WEI LI

49

```
 1   A.        It has nothing to do with this.

 2   Q.        Are you refusing to answer?

 3   A.        Correct.

 4   Q.        Did you talk to anyone other than Mr. Liu to

 5   prepare for your testimony?

 6   A.        Other departments.

 7   Q.        Who?

 8   A.        Marketing.

 9   Q.        Who in marketing?

10   A.        Wang Yao.

11   Q.        How do you spell that?

12   A.        Wang, W-A-N-G; Yao, Y-A-O.

13   Q.        What is Wang Yao's position in the marketing

14   department?

15   A.        The deputy manager.

16   Q.        What information did you ask Wang Yao for

17   today's deposition?

18   A.        Information relating to marketing.

19   Q.        Could you be more specific?

20   A.        I ask for information relating both to

21   Delaware and California.

22   Q.        Did you get any information?

23   A.        Yes.

24   Q.        What information did you get?
```

WEI LI

50

1    A.        2006 RSA meeting information.

2    Q.        Anything else?

3    A.        I cannot hear.

4              The information related to this case was what

5    I just told you.

6    Q.        I don't understand your answer.  Do you mean

7    that the only thing you got from Wang Yao was the

8    information about the 2006 RSA Conference?

9    A.        Yes.

10   Q.        Did you ask whether there was any advertising

11   directed to California or Delaware by Feitian?

12   A.        I ask.

13   Q.        And what were you told?

14   A.        He did not find any information related to

15   this.

16   Q.        Mr. Li, you said you asked.  What were you

17   told when you -- who did you ask and what were you told

18   about advertising directed towards Delaware and

19   California?

20   A.        I asked for Wang Yao, and he didn't answer

21   the second question.  He said that he did not find the

22   information.

23   Q.        Okay.  What other departments did you talk to

24   to prepare for the deposition?

1    A.        No, no other departments.

2    Q.        Does Wang Yao speak English?

3    A.        No.

4    Q.        Okay.  Other than the purchase orders and

5    invoices that we've gone over tonight -- or today, are

6    there any other purchase orders or invoices that you

7    found concerning sales by Feitian to California?

8    A.        No.

9    Q.        Do you know whether or not Feitian has made

10   any sales to Delaware before 2006?

11   A.        Only information I have I have turned over to

12   my lawyer.

13   Q.        Okay.  Did you ask Mr. Liu to check his

14   e-mails to see if there was any communication from

15   Mr. Liu to anyone in California or from anyone in

16   California to Mr. Liu?

17   A.        I have asked.

18   Q.        And did he give you any e-mails other than

19   that one that we already discussed from and to Larry

20   Doyle?

21   A.        He did not found any others.

22   Q.        Who is Rachel Liu?

23             INTERPRETER # 3:  I did not hear.  Are

24             you asking Rachel Liu's Chinese name?

WEI LI

52

1              MS. O'LAUGHLIN:  No.  I'm asking if he

2         knows what -- do you know a Rachel Liu who is

3         the sales and marketing manager of Feitian?

4              THE WITNESS:  Yes.

5    BY MS. O'LAUGHLIN:

6    Q.       Okay.  Is Ms. Liu still employed by Feitian?

7              INTERPRETER # 3:  I cannot hear him.

8              THE WITNESS:  She quit.

9    BY MS. O'LAUGHLIN:

10   Q.       Okay.  Did you ask anyone to check through

11   her records to see if she had any communications to

12   California or Delaware?

13   A.       Yes.

14   Q.       Who did you ask to look through her e-mails?

15   A.       Liu Hui.

16   Q.       Okay.  And did he find -- well, are all of

17   Ms. Rachel Liu's e-mails still at Feitian?

18   A.       After her computer was examined, then the

19   computer was given to someone else to use.

20   Q.       When was her computer examined?

21   A.       When he left the corporation -- I'm sorry.

22   When she left the corporation.

23   Q.       When did she leave the corporation?

24   A.       It was last year.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WEI LI

53

1    Q.          Okay.  So I'm trying to understand when you

2    said that you asked someone to review her e-mails, are

3    her e-mails still in the computers at Feitian?

4    A.          We review that information.  If we found that

5    information is useful, then we copied it and then keep

6    it, then we give her computer to someone else for use.

7    Q.          So when you said that you -- testified that

8    you asked Mr. Liu to look through Rachel Liu's e-mails,

9    what e-mails -- were those e-mails that were on the

10   computer or e-mails that you had already printed out

11   and just kept in some record?

12   A.          The information was not printed out.  It was

13   transferred to Liu Hui's computer.

14   Q.          So do you know whether or not -- so if

15   Ms. Liu's information -- was all of the information on

16   her computer was transferred to Mr. Liu's computer?

17                        INTERPRETER # 3:  I have to ask him to

18              repeat.

19                        THE WITNESS:  When the computer was

20              examined, if there's any information which is

21              useful, then that piece of information was

22              transferred to Liu Hui's computer.

23   BY MS. O'LAUGHLIN:

24   Q.          Ms. Rachel Liu could have had communication

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WEI LI

54

1   with California in e-mails and those e-mails were not

2   transferred to Mr. Liu; is that correct?

3                    MR. REEVES:  Objection.  It calls for

4          speculation.

5                    MS. O'LAUGHLIN:  Let me ask him this.

6   BY MS. O'LAUGHLIN:

7   Q.        Am I correct that not all of Ms. Liu's

8   e-mails to people in the United States were transferred

9   to Mr. Liu's computer?

10  A.        Whatever we thought are useful have been

11  transferred.

12  Q.        Okay.  Do you know Cecile Stadler,

13  S-T-A-D-L-E-R?

14                    INTERPRETER # 3:  S-T-A-D?

15                    MS. O'LAUGHLIN:  L-E-R.

16                    INTERPRETER # 3:  L-E-R?

17                    MS. O'LAUGHLIN:  Yes.

18                    INTERPRETER # 3:  What's the question,

19          please?

20  BY MS. O'LAUGHLIN:

21  Q.        Do you know Cecile Stadler; who she is?

22  A.        Yes.

23  Q.        Okay.  And who is she?

24  A.        She is a department manager.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WEI LI

1    Q.        For what department?

2    A.        International sales department.

3    Q.        And that would include sales to the United

4    States; is that correct?

5    A.        Yes.

6    Q.        Okay.  And is Ms. Stadler still an employee

7    of Feitian?

8    A.        No.  She left the corporation.

9    Q.        When?

10   A.        2005.

11   Q.        And do you know who May Wang is?

12   A.        Yes.

13   Q.        Who is she?

14   A.        She used to be a sales manager.

15   Q.        And is she with the -- in fact, she was the

16   sales manager?  She was in charge of sales for the U.S.

17   market; isn't that true?

18   A.        She was still her trial period and they did

19   not wait until to finish the trial period and she left

20   the corporation.

21   Q.        That's not my question.  My question was,

22   when Ms. Wang was at Feitian, she was the sales manager

23   responsible for the U.S. market; is that correct?

24   A.        Her position was assistant to Rachel Liu.

WEI LI

56

1    Q.         Okay.  And Rachel Liu was responsible for the

2    U.S. market?

3    A.         Yes.

4    Q.         And how long did Ms. Wang work at Feitian?

5    A.         Several months, for a couple months.

6    Q.         Do you know John O'Mara -- do you remember

7    when she left Feitian?

8    A.         In year 2005.

9    Q.         Okay.  Do you know John O'Mara?

10   A.         Yes.

11   Q.         Okay.  And who is Mr. O'Mara?

12   A.         He used to be the manager of international

13   sales.

14   Q.         Okay.  And is he still at Feitian?

15   A.         No.

16   Q.         When did he leave?

17   A.         In year 2004.  Did you ask when Mr. O'Mara

18   left the corporation?

19   Q.         Yes.  Yes.

20   A.         I think it's in year 2004.

21   Q.         Okay.  To prepare for the responses of

22   Feitian to Aladdin's questions about jurisdictional

23   discovery, did you review or did you ask anyone to look

24   through the records to see if there were any records

WEI LI

57

1    from Cecile Stadler, John O'Mara, May Wang, or Rachel

2    Liu concerning communications to or from California or

3    Delaware and Feitian?

4    A.        After they left the corporation their

5    computers were given to other people to use.

6    Q.        My question was, did anyone -- did you ask or

7    did you review any of the information that's on their

8    computers in order to help prepare responses to

9    jurisdictional discovery requests in this case?

10   A.        Their computer had already been used by other

11   people and have been formatted.

12   Q.        Have been what?

13             INTERPRETER # 3:  In his word, in his

14             word, he said it's formatted.

15   BY MS. O'LAUGHLIN:

16   Q.        By formatted do you mean erased or what -- do

17   you mean that the information that was contained on the

18   computer when it was used by these people it was

19   erased?

20   A.        It was like what I said earlier.  We looked

21   at the computer and we copied the information which we

22   thought would be useful.

23   Q.        And you copied that and put it on Mr. Liu's

24   computer?

WEI LI

58

1   A.        The information in May Wang's computer was

2   copied to Rachel Liu's computer.

3   Q.        Okay.  And then was the information from

4   Rachel Liu's computer copied to Hui Liu's computer?

5   A.        Yes.

6   Q.        Okay.  Do you know Wang Dong?

7   A.        Yes.

8   Q.        And who is he?

9   A.        He was sales manager.

10  Q.        Sales manager.  Was he also involved and

11  responsible for sales in the U.S. market?

12  A.        No.  He is responsible for other areas.

13  Q.        Is he still with Feitian?

14  A.        No.

15            INTERPRETER # 3:  This is interpreter

16            asking.  Unless he specifically saying -- we

17            don't have the present tense -- so when I

18            said it, that's really not meaning you

19            answered the right question.  He said he's no

20            longer with Feitian.

21  BY MS. O'LAUGHLIN:

22  Q.        And Wang Dong, just so we're clear -- it's

23  W-A-N-G, D-O-N-G, in case I'm mispronouncing it -- is

24  Wang Dong still employed by Feitian?

WEI LI

59

```
 1                    INTERPRETER # 3:  He answer he left the

 2               corporation.

 3   BY MS. O'LAUGHLIN:

 4   Q.          He left the corporation?

 5   A.          He is no longer with the corporation.

 6   Q.          When did he leave?

 7   A.          In year 2005.

 8   Q.          And what did he do at Feitian?

 9   A.          Sales manager.

10   Q.          Did he speak English and write English?

11   A.          Yes.

12   Q.          Did anyone in order to respond to any of the

13   jurisdictional discovery requests in this case review

14   any of Mr. Dong's records including his computer

15   records?

16   A.          Since Wang Dong was not responsible for the

17   markets, he had nothing to do with this case.

18   Q.          Okay.  So the answer is no, you didn't check

19   Mr. Dong's records or his computer?

20   A.          Because he left the corporation so his

21   computer was also used by other people.

22   Q.          Wasn't Mr. Dong's title international sales

23   and marketing manager?

24   A.          Yes.
```

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WEI LI

60

1   Q.          And doesn't international sales include sales

2   in the United States?

3   A.          He was not responsible for sales to U.S.

4   market.

5   Q.          My question is, doesn't international sales

6   include sales to the U.S. market?

7   A.          However, inside that department everyone

8   has -- everyone is responsible for a different area.

9   It was sales different area.

10  Q.          So is it your testimony that Mr. Dong had

11  nothing to do with any sales in the United States?

12  A.          He might have helped other people for those

13  two U.S. market.

14  Q.          Were any of Mr. Dong's records transferred to

15  Mr. Liu's computer?

16  A.          If there's any information relating to sales

17  to U.S. markets, that information would have been

18  transferred to Ms. Hui's computer.

19  Q.          I misunderstood your earlier testimony then,

20  Mr. Li.  Are you saying that any information concerning

21  the U.S. sales from any other computers was transferred

22  to Mr. Liu's computer?

23  A.          Whose information you are talking about?

24  Q.          Mr. Dong's information.

WEI LI

61

```
 1   A.          Yes.

 2   Q.          Okay.  And was all the information from John

 3   O'Mara's computer transferred to Mr. Liu's computer

 4   concerning U.S. sales or communications with the U.S.?

 5   A.          No.

 6   Q.          What about Ms. Stadler?

 7                    MR. REEVES:  Wait a minute.  Wait a

 8               minute.  I'm going to object to this line of

 9               questioning to the extent it seeks

10               information about U.S. sales.  To the extent

11               the question is limited to sales related to

12               California and Delaware, that's okay.

13               Otherwise, I object.

14   BY MS. O'LAUGHLIN:

15   Q.          You can answer, Mr. Li.

16   A.          It's in my computer.

17   Q.          So all of Ms. Stadler's e-mails and

18   communications with the United States are in your

19   computer?

20                    MR. REEVES:  Again, I object to the

21               extent the question seeks information to the

22               United States as a whole and is not limited

23               to California or Delaware.

24   BY MS. O'LAUGHLIN:
```

WEI LI

1   Q.         You can answer, Mr. Li.

2   A.         The information which we thought was useful

3   is in my computer.

4   Q.         Okay.  And did you review that information in

5   providing responses to the jurisdictional discovery

6   requests and in preparing for your deposition?

7   A.         Yes.

8   Q.         Did you find any information, any

9   communication between Ms. Stadler and anyone in

10  California or from anyone in California to Ms. Stadler?

11  A.         No, I did not find.

12  Q.         Let's talk about the RSA Conference in 2006.

13  Feitian representatives or employees of Feitian

14  attended that conference; is that correct?

15                   INTERPRETER # 3:  Would you please

16             repeat the question?  I didn't get it.

17                   MS. O'LAUGHLIN:  Yes.

18  BY MS. O'LAUGHLIN:

19  Q.         Representatives of Feitian attended the 2006

20  RSA Conference; is that correct?

21  A.         Yes.

22  Q.         Okay.  Who attended the RSA Conference in

23  2006 from Feitian?

24  A.         Liu Hui.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WEI LI

63

1   Q.        Anyone else?

2   A.        The person sent by the corporation was Liu

3   Hui.

4   Q.        Did anyone else from Feitian attend?

5   A.        I do not know whether Liu Hui also ask other

6   people from Feitian to help him with those meeting.  I

7   have to find out.

8   Q.        If you could look at the documents that you

9   sent to your attorney, there's an RSA Conference 2006

10  Exhibitor Contract.  Do you see that?

11  A.        Yes, we have the information.  Okay.  We have

12  the form, yes.

13  Q.        For the record, that document is Bates FT

14  0054.  The contract is signed by Michael Liu and the

15  name on it is Michael Liu.  That's, again, Hui Liu; is

16  that correct?

17  A.        Yes.

18  Q.        The contract indicates that Feitian was

19  getting a booth and paying a booth fee of $5995 for the

20  booth?

21              INTERPRETER # 3:  $5090?

22              MS. O'LAUGHLIN:  $5995.

23              INTERPRETER # 3:  $5995 for a booth?

24              MS. O'LAUGHLIN:  Yes.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

1                    INTERPRETER # 3:  Have you finished your

2              question?

3                    MS. O'LAUGHLIN:  No.

4    BY MS. O'LAUGHLIN:

5    Q.        Did Feitian pay that booth fee that's

6    indicated in the Exhibitor Contract?

7    A.        Yes, it was paid.

8    Q.        Okay.  And it was paid with a Visa card and

9    the name on the Visa card was Huang Yu?

10                   INTERPRETER # 3:  What's the name?

11                   MS. O'LAUGHLIN:  It's H-U-A-N-G and then

12             Y-U.

13                   THE WITNESS:  An employee of our

14             company.

15   BY MS. O'LAUGHLIN:

16   Q.        What's his position at the company?

17   A.        Manager.

18   Q.        Manager in what department?

19   A.        It has nothing to do with this.

20   Q.        Are you refusing to answer, Mr. Li?

21                   MR. REEVES:  I object.  That's not what

22             he said.

23                   MS. O'LAUGHLIN:  He said -- I asked him

24             a question and he says it has nothing to do

WEI LI

65

1      with this.  My follow-up question is, are you

2      refusing to answer.  If he doesn't

3      understand, I will ask the question again.

4              MR. REEVES:  Let's go back.  You asked

5      him who was Huang Yu, right?

6              MS. O'LAUGHLIN:  Yes, and he said

7      manager.

8              MR. REEVES:  He said manager.

9              MS. O'LAUGHLIN:  Then I had said

10      something of what department, and he said it

11      has nothing to do with this and --

12              MR. REEVES:  I didn't hear that answer.

13      Ask him the question again.  Manager in what

14      department?

15  BY MS. O'LAUGHLIN:

16  Q.      Mr. Li, in what department is Huang Yu a

17  manager?

18  A.      A manager of the corporation.

19  Q.      In what department?

20              MR. REEVES:  I'll object to the

21      relevance to the question anyway.

22  BY MS. O'LAUGHLIN:

23  Q.      You can answer, Mr. Li.

24              INTERPRETER # 3:  This is the

WEI LI

66

1    interpreter.  Mr. Li would like me to

2    translate his lawyer's statement, but I did

3    not hear the statement of his lawyer.  Would

4    you --

5         MR. REEVES:  I object to the question as

6    to manager of what department as being

7    irrelevant.

8         MS. O'LAUGHLIN:  Relevancy is not a

9    proper objection at this deposition.

10        MR. REEVES:  I disagree with that.  I

11   think relevancy is a proper objection at any

12   deposition.

13        MS. O'LAUGHLIN:  Well, that's not true

14   under the Federal rules, and also this

15   Exhibitor Contract was signed.  There's an

16   authorized signature of Huang Yu.  It's for a

17   conference held in San Jose, California, and

18   I think it is totally relevant for me to ask

19   who Huang Yu is and what department he's in.

20        MR. REEVES:  Well, you've asked.  He's

21   answered.  He said he's an employee, and now

22   he's told you his title is he's some kind of

23   manager of the company, and you continue to

24   ask questions about Mr. Huang.  I think the

WEI LI

67

1          questions aren't relevant anymore, and I

2          object to them.

3              MS. O'LAUGHLIN:  Okay.  You object to

4          them.  Are you instructing him not to answer?

5              MR. REEVES:  No, I'm not instructing him

6          not to answer, but I'm putting my objection

7          on the record.

8   BY MS. O'LAUGHLIN:

9   Q.      Mr. Li, please answer the question.

10  A.      We borrowed his Visa card to make the

11  payment.  His position has nothing to do with this.

12  Q.      Is he involved in international sales?

13  A.      No, no relationship.

14  Q.      The brochures that were produced to us, the

15  BioPass 3000 and the ePass Security Token, were those

16  brochures handed out at the RSA 2006 conference by

17  Feitian?

18              INTERPRETER # 3:  This is the

19          interpreter.  May I know the brochure, what

20          are the products?  Would you please --

21              MS. O'LAUGHLIN:  The first brochure is

22          called BioPass 3000, and it was Bates stamped

23          FT 0008 and 0009, and the other is ePass

24          Security Token Bates stamped FT 00010 through

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WEI LI

68

1           20.

2                   INTERPRETER # 3:  Okay.  One is ePass

3           Security Token.  The other one is?

4                   MS. O'LAUGHLIN:  BioPass 3000.

5                   INTERPRETER # 3:  BioPass?

6                   MS. O'LAUGHLIN:  B-I-O, P-A-S-S 3000.

7                   INTERPRETER # 3:  BioPass 3000.

8                   THE WITNESS:  Okay.  The brochure

9           relating to ePass Security Token was not

10          distributed.

11  BY MS. O'LAUGHLIN:

12  Q.      Was the ePass Security Token brochure

13  distributed at any prior RSA Conference?

14  A.      From the information we have today I did not

15  find the brochure was distributed to California or to

16  Delaware.

17  Q.      Okay.  Which brochure are you talking about,

18  the ePass Security Token brochure?

19  A.      Yes.

20  Q.      Okay.  But the BioPass brochure was

21  distributed at the RSA Conference in 2006; is that

22  correct?

23  A.      Yes.

24  Q.      Okay.  And if in answers to written discovery

WEI LI

69

1    requests Feitian said that the ePass brochure was

2    distributed at an RSA Conference, is that incorrect or

3    correct to your knowledge?

4                    INTERPRETER # 3:  Would you please

5              repeat the question for the interpreter?

6    BY MS. O'LAUGHLIN:

7    Q.         Yes.  Mr. Li, if in answers to written

8    discovery requests in this case it was indicated that

9    the ePass brochure was distributed at an RSA

10   Conference, is that incorrect information?

11   A.         What do you mean by the written requests?

12   Q.         Okay.  There were written requests sent to

13   Feitian called Interrogatories and Requests for

14   Admissions.

15                   MR. REEVES:  And let me object to the

16              question to the extent it misrepresents the

17              interrogatory answer.

18   BY MS. O'LAUGHLIN:

19   Q.         Mr. Li, are you aware of any brochures or

20   other informations that was handed out by Feitian at

21   any RSA Conference it attended?

22   A.         I do not know.

23   Q.         Okay.

24   A.         I'm not certain.

WEI LI

1  Q.        Pardon?

2  A.        I'm not certain.

3  Q.        Okay.  Did you in preparing for the

4  deposition get any information about Feitian's

5  participation in the RSA Conference in California in

6  the years other than 2006?

7  A.        I did not find.

8             MR. REEVES:  Translator, could you

9             repeat that answer?  I did not hear it.

10            INTERPRETER # 3:  Yeah.

11            MS. O'LAUGHLIN:  We didn't understand

12            that, your last interpretation.  What did you

13            say?

14            THE INTERPRETER:  Okay.  Mr. Li said, I

15            did not find the information.

16  BY MS. O'LAUGHLIN:

17  Q.        Okay.  Mr. Li, that's not my question.  My

18  question is, in preparing for the deposition, did you

19  ask for any information about Feitian's attendance at

20  any RSA Conference in California other than the

21  attendance in the year 2006?

22  A.        Yes, I have asked.

23  Q.        And do you know whether or not -- what did

24  you find out about Feitian's attendance at the RSA

WEI LI

71

1    Conference in California in years other than 2006?

2    A.          I found out that Feitian attended RSA

3    meetings in 2003 and 2005.

4    Q.          And what about 2004?

5    A.          Feitian did not attend in 2004.

6    Q.          Okay.  What was the purpose for Feitian

7    attending the RSA Conferences in California in the

8    year -- all those years?

9                    INTERPRETER # 3:  In other years?

10   BY MS. O'LAUGHLIN:

11   Q.          In those years.

12   A.          It's for the exchange of technology.

13   Q.          Why did Feitian distribute brochures about

14   its products at the RSA Conferences?

15   A.          For the others to understand our technology.

16   Q.          Did Feitian hope to generate sales as a

17   result of its attendance at the RSA Conferences in

18   California?

19   A.          No.

20   Q.          So it was not -- your testimony is it was not

21   Feitian's purpose or hope to generate any revenue from

22   sales in the United States or in California as a result

23   of its attending the RSA Conferences; that the only

24   purpose was for attending these to understand Feitian's

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WEI LI

72

1   products?

2   A.          That's right.

3   Q.          Did Feitian keep a -- did Feitian get a booth

4   at the RSA Conference in any year other than in 2006?

5                    INTERPRETER # 3:  A what?

6                    MS. O'LAUGHLIN:  A booth.

7                    THE WITNESS:  Yes.

8   BY MS. O'LAUGHLIN:

9   Q.          What years?

10  A.          2005 and 2003.

11  Q.          Did Feitian sign a contract for the purchase

12  or leasing of those booths in 2003 and 2005?

13  A.          I don't know.

14  Q.          Do you know what the cost of the booths in

15  2003 and 2005 was for Feitian?

16  A.          I did not find the information.

17  Q.          Do you know who from Feitian attended the RSA

18  Conference in 2003?

19  A.          John.

20  Q.          I don't understand.

21  A.          J-O-H-N, John.

22  Q.          John O'Mara?

23  A.          Yes.

24  Q.          Anyone else?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WEI LI

1    A.        He was the person sent by our corporation.

2    Q.        In 2005, who attended the RSA Conference?

3    A.        Cecile Stadler.

4    Q.        Cecile Stadler?

5    A.        Yes.

6    Q.        Anyone else from Feitian?

7    A.        Rachel Liu.

8    Q.        Rick Landow?

9    A.        Rachel Liu.

10   Q.        Anyone else?

11   A.        No.

12   Q.        Okay.  I'm looking, Mr. Li, at Feitian's

13   responses to Plaintiff's Second Request for Admissions

14   on Jurisdictional Issues, and in response to request

15   for admission number 22 it provides Feitian admits that

16   it attended the RSA Conference in 2005 and that it

17   distributed a brochure about its ePass product at the

18   conference.  Is it your testimony that the only reason

19   that Feitian distributed a brochure about its ePass

20   product at the RSA Conference in 2005 was to give out

21   information about its ePass product as opposed to

22   trying to generate sales or revenues resulting from its

23   ePass product?

24               INTERPRETER # 3:  This is the

WEI LI

74

1          interpreter.

2                    MS. O'LAUGHLIN:  Yes.

3                    INTERPRETER # 3:  This is too long.

4                    MS. O'LAUGHLIN:  Let me break it up.

5                    INTERPRETER # 3:  Yes, would you please.

6    BY MS. O'LAUGHLIN:

7    Q.          Tell him that in response to Plaintiff's

8    Second Request for Admissions on Jurisdictional Issues,

9    Feitian stated that it admitted it attended the RSA

10   Conference in 2005 and that it distributed a brochure

11   about its ePass product at the conference.

12              Is it your testimony that Feitian distributed

13   the brochure about its ePass product not to -- no.

14   Strike that.  Sorry.

15              Is it your testimony that the only -- that

16   Feitian did not want to generate any sales of its ePass

17   product by distributing that brochure, but it only

18   wanted to give out information about the product?

19   A.          Yes.

20   Q.          So is it your testimony that Feitian did not

21   want to make sales of its ePass products to anyone in

22   California?

23                    MR. REEVES:  Objection.  That misstates

24              his testimony.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WEI LI

75

1   BY MS. O'LAUGHLIN:

2   Q.        Is it your testimony that Feitian did not

3   want to generate sales of its ePass product by passing

4   out those brochures at the RSA conference?

5                   MR. REEVES:  I'll object to that.  He's

6                   answered that question twice now.

7   BY MS. O'LAUGHLIN:

8   Q.        Did Feitian ever solicit business in

9   California?

10                  INTERPRETER # 3:  Did Feitian ever?

11                  MS. O'LAUGHLIN:  Solicit business in

12                  California.

13                  THE INTERPRETER:  Okay.

14                  THE WITNESS:  No.  Our sales was through

15                  the distributor.

16  BY MS. O'LAUGHLIN:

17  Q.        Did Feitian ever tell its distributor to seek

18  sales in California?

19  A.        No, that's the matter of the distributor.

20  Q.        The major of the distributor?

21  A.        Matter, M-A-T-T-E-R.

22  Q.        The matter of the distributor.  If Feitian

23  got an inquiry from someone in California about its

24  products, would Feitian then respond to that inquiry?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WEI LI

1          INTERPRETER # 3:  I have to make sure.

2          THE WITNESS:  We would turn over the

3          inquiry to the distributor.

4    BY MS. O'LAUGHLIN:

5    Q.        Right.  And the purpose of turning over the

6    inquiry to the distributor was to have the distributor

7    make a sale to the person inquiring; is that correct?

8    A.        That's the distributor's matter.

9    Q.        Well, why did Feitian have a distributor if

10   not to sell its products through the distributor?

11   A.        I do not understand.

12   Q.        I think you do, Mr. Li.  My question is, why

13   did Feitian bother to have a U.S. distributor if it

14   didn't -- strike that.

15             Mr. Li, I think that you understood my

16   question, but let me rephrase it for you.

17             MR. REEVES:  And I object to that.

18             That's simply arguing with the witness.

19             MS. O'LAUGHLIN:  I'm not finished my

20             question.

21             MR. REEVES:  Okay.

22   BY MS. O'LAUGHLIN:

23   Q.        And I think I deserve a little argument with

24   this witness.

WEI LI

1            But in any event, what was the purpose of

2    having -- entering into a contract, a distribution

3    agreement with a company to distribute your products in

4    the United States?

5                    INTERPRETER # 3:  That's your question?

6                    MS. O'LAUGHLIN:  Yes.

7                    THE WITNESS:  The purpose is for selling

8            the products.

9    BY MS. O'LAUGHLIN:

10   Q.        For selling the products, right, in the

11   United States?

12   A.        When there is a customer, whether the product

13   will be selled to the customer or not will be

14   determined by the distributor.

15   Q.        Does Feitian still have a distributor in the

16   United States?

17   A.        No.

18   Q.        Does AZ-Tech Software distribute any of

19   Feitian's products in the United States?

20                    INTERPRETER # 3:  Which corporation?

21                    MS. O'LAUGHLIN:  AZ-Tech.

22                    INTERPRETER # 3:  T-E-C-H.  So your

23            question is -- would you please repeat?

24   BY MS. O'LAUGHLIN:

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**